# CHARLESTON.

## STATE *v.* EDDY *et al.*

### Submitted April 10, 1895—Decided Nov. 16, 1895,

1. TAX SALES—PURCHASE BY TAX-OWER

    One who is under any legal or moral obligation to pay taxes on land can not, by neglecting to pay the same, and allowing the land to be sold in consequence of such neglect, add to or strengthen his title, either by purchasing at the sale himself, or suffering a stranger to buy and then purchasing from him.

2. TAX SALES—PURCHASE BY TAX-OWER—MISTAKE IN CERTIFYING TAXES.

    Where land has been returned delinquent for several years, and the auditor, in certifying the land to the Sheriff for sale, through mistake omits to certify the taxes for several of the years for which it was returned delinquent, only certifying the last two years, for which it is sold by the sheriff, a purchase made by the owner, or by one representing the owner at such sale, with notice of such mistake, will confer no title upon the purchaser, nor will such sale prevent the state from collecting the taxes on said land for the years which the auditor failed, through mistake, to certify.

3. TAX SALES—PURCHASE BY TAX-OWER.

    A purchase of land at a sale for delinquent taxes by the owner, or by one whose duty it is to pay the taxes, merely operates as a payment of the taxes, and a redemption of the land for the years for which it is sold.

W. Mollohan, E. L. Buttrick and Arthur C. Denniston for appellants, cited 1 Black. Tax Tit. §§ 587, 589; 2 Id. §§ 989, 993, 1050, 1057; 4 Gilmore, 221; Code c. 31, ss. 1, 4, 29; 31 Iowa, 150; 36 Id. 505; 50 Cal. 15; 22 Wis. 225; 22 Pa. St. 368; 19 S. E. Rep. 509; 11 Leigh, 339; 18 W. Va. 441; 29 W. Va. 663; 9 Ill. 221; 9 How. (U. S.) 311, 316, 317; 5 Pet. 369; 33 Minn. 49; 65 Ind. 549.

Attorney-General T. S. Riley and Brown, Jackson & Knight for appellee, cited 1 Black. Tax Tit. (5th Ed.) § 505; 25 Cal. 45; Black. Tax Tit. § 273; 46 Conn. 524; 57 Wis. 582; 94 U. S. 405; 38 Iowa 551; 46 Iowa 585; Minn. Stats. (1878) § 87; Code, c. 31, ss. 4, 7, 29, 31; 115 N. Y. 509; 134 U. S. 559; 24 W. Va. 579; 34 W. Va. 101, 207; 36 W. Va. 213; Acts 1889–90, p. 182; 18 W. Va. 612; 15 Gratt. 213-222; 99 Ill. 520; 16 Mich. 366; 20 Wis. 228; Cooley, Tax. 345.

English, Judge:

This is an appeal taken by Samuel Eddy and others from a decree of the Circuit Court of Cabell county to which court the cause had been removed from the Circuit Court of Lincoln county.

The Transmontaine Land Company, a corporation, was the owner of certain lands, the greater portion of which were located in Lincoln county, W. Va., described as containing one hundred thousand acres, which lands were mortgaged to secure certain bonds. A suit was brought in the United States court by Frederick Prentice to subject the land to sale for the payment of the bonds, and one Howell Smith was appointed receiver. During the pendency of said suit the receiver, under direction of the court, borrowed fifteen thousand dollars from one William G. Sands to pay taxes on the lands for years prior to 1879. On the 17th day of October, 1883, said lands were sold by Smith and Knight, special commissioners under a decree of the United States district court, at which sale said lands were purchased by J. C. Saunders, as agent for W. G. Sands, for the sum of twenty seven thousand, five hundred dollars. On the 3rd day of November, 1883, one Otto Kersten bid thirty thousand dollars for said property, and offered to comply with the terms of sale; and on the 20th

day of November, 1883, said W. G. Sands, by J. C. Saunders, his agent, filed his petition in said case, increasing his bid to thirty one thousand dollars, which bid was reported, and the sale was confirmed to said W. G. Sands.

This land was wholly omitted from the land books of the county of Lincoln for the years 1879, 1880, 1881, and for each of said years no taxes were assessed against the same. In the year 1882 it was entered on the land books of said county, and assessed with taxes in the name of Howell Smith, receiver for the Transmontaine Land Company for the years 1879, 1880, and 1881, and duly assessed with the back taxes and interest for said years respectively. These lands, not having been redeemed, were returned delinquent, and in the year 1883 certified to the sheriff of said county of Lincoln to be sold to pay the taxes due thereon, with the interest and costs; but sale thereof was enjoined by the district court of the United States in a suit therein pending of John Ward and others against the sheriff of Lincoln county and others, which was prosecuted for the benefit of said Transmontaine Land Company, its creditors having liens thereon, and others interested therein. Said lands were also charged on the land books of Lincoln county for the year 1883 in the name of said Howell Smith, receiver, and for the year 1884 in the name of W. G. Sands, the taxes not having been paid, and the land returned delinquent. In the year 1885, the auditor certified said lands to the sheriff of Lincoln county for sale for the taxes for the years 1883 and 1884, but failed to certify them again for the years 1879, 1880, 1881, and 1882. The sheriff of said county advertised the land for sale for the years 1883 and 1884, as certified to him, and sold it for the taxes of said last named years, at which sale Samuel Eddy became the purchaser of the land for the taxes of said two years; and, the same not having been redeemed within one year from the date of the sale, said Eddy obtained a tax deed from the clerk of the County Court of Lincoln county to himself in pursuance of said purchase. The land was then entered in the name of said Eddy as owner upon the land books of said county for the years 1886 and 1887, the taxes were paid for the years 1885 and 1886, and said lands were

also charged in the name of said Eddy for the years 1888,
1889; and in 1890, the taxes for said last two years not hav-
ing been paid, they were returned delinquent, and certified
by the auditor to the sheriff of said county for sale in the
name of said Eddy as owner, and were sold, at which sale
one Joseph S. Clark became the purchaser, but on applica-
tion of the state the clerk of the county court of Lincoln
county was enjoined from making a deed to said Clark for
said land in pursuance of said sale. At the time said pur-
chase was made by Samuel Eddy, there was no statute
authorizing the state to bring a suit to set aside a sale for
taxes, no matter to what extent such sale may have been
tainted with fraud or irregularity; but in 1887 the legisla-
ture so amended section 1 of chapter 31 of the Code as to
authorize a suit in equity to be instituted by the auditor in
the name of the state to enforce the lien for taxes unpaid, or
for which no sale has been made, whether such lien com-
menced before said act was passed or arose thereafter.

Under said statute a suit in equity was instituted in
the name of the state. The original bill does not ap-
pear as a part of the record, but on the 19th day of Feb-
ruary, 1890, the plaintiff was permitted to file an amended
and supplemental bill against Samuel Eddy, the Trans-
montaine Land Company of West Virginia, a corporation
created and organized under the laws of the state of West
Virginia, John Ward, Robert T. French, and Thomas
Foulkes, trustees, Samuel T. W. Sanford and Thomas Ball,
trustees, Howell Smith, receiver, W. G Sands, Frederick
Prentice, Edward B. Knight, and Howell Smith, special
commissioners, in which bill were recited the facts as to
the manner in which the title to said one hundred thous-
and acres of land was conveyed to trustees for said Trans-
montaine Land Company; that said company subsequently
directed said land to be conveyed by trustees to secure the
payment of two hundred and fifty bonds of one hundred
dollars each; and that, default having been made in the
payment of said bonds, Frederick Prentice, a holder of part
of said bonds, on the 28th of December, 1881, brought a
suit in equity in the United States District Court for the
district of West Virginia for the purpose of enforcing said

trust for the payment of said bonds; also for the appointment of a receiver to take possession and charge of said land and all assets of the Transmontaine Land Company, and that Howell Smith was appointed receiver of said company; also as to said land being omitted from the land books of Lincoln county for the years 1879, 1880, and 1881, and that in 1882 it was entered in the name of Howell Smith, receiver, on the land books for the years 1879, 1880, 1881, and 1882, in said county, and assessed and charged with the back taxes and interest for said years respectively; that no part of the taxes being paid for said years, the land was returned delinquent, and was certified to the sheriff of said county for sale, but the sheriff was restrained by injunction from making sale thereof; that in the suit of Frederick Prentice against the Transmontaine Land Company and others it became necessary for said Howell Smith, receiver, to borrow fifteen thousand dollars to pay the taxes due on said land prior to the year 1879, which he did from William G. Sands, of the city of New York, which, with the interest thereon, amounted to sixteen thousand five hundred and ninety two dollars and eighty three cents on the 1st day of May, 1883, which was by the court decreed a first lien on said land; that on the 5th day of May, 1883, Howell Smith and E. B. Knight were appointed special commissioners by said court to make sale of said land, which they did, and the same was knocked down to William G. Sands at the price of twenty seven thousand, five hundred dollars; that they afterwards received an upset bid of thirty thousand dollars from one Otto Kersten, and that said Sands then filed his petition in said court, increasing his bid to thirty one thousand dollars, which bid was made and petition filed by J. C. Saunders as agent for said Sands, said Saunders being president of the Transmontaine Land Company, who came from the city of New York to Charleston, W. Va., to attend said sale, and to protect the interest of said Sands; and on the 23d day of November, 1883, said sale was confirmed to said Sands at the price of thirty one thousand dollars, subject to the lien of the taxes thereon since the year 1878; that the said J. C. Saunders, who was president of the Transmontaine Land Company,

who bought in said land for William G. Sands in this way, knew that no taxes had been paid on said lands since the year 1878; that said land was purchased subject to the lien for the taxes thereon since said year 1878, and that his interest in the land was so great, and he so anxious to purchase the same, that he increased his bid from twenty seven thousand, five hundred dollars to thirty one thousand dollars. The bill specifically charges that the purchase of said land by Samuel Eddy for taxes and the deed to him therefor was in fact a purchase by said William G. Sands and his associates, and constituted a redemption of said land, and that the whole transaction bears upon its face the stamp of fraud, and was a fraud upon the state of West Virginia, the county of Lincoln, and the several districts thereof, and was done for the sole purpose of defrauding said state, county, and districts of the taxes due upon said lands for the years 1879, 1880, 1881, and 1882, and each of them; and that said tax deed should be set aside, and the lien for said taxes enforced; and the circumstances are detailed in the bill which are relied upon to establish such fraudulent purchase. It is alleged that said lands at the time of such sale were worth at the least three hundred thousand dollars, and that said Sands was at the time of said sale a director of and interested in said Transmontaine Land Company. The plaintiff, in its bill, details the circumstances relied upon to show that said purchase was made for the benefit of the owners and those interested in said Transmontaine Land Company, and with the intent to defraud the state, county, and districts therein of the taxes due thereon, and that said purchase constituted a mere redemption thereof, and propounds several interrogatories to the defendants Samuel Eddy, W. G. Sands, Frederick Prentice, and Howell Smith.

To this bill answers were filed by Samuel Eddy, Frederick Prentice, and Catherine Packard, heir at law and personal representative of William G. Sands, putting in issue the material allegations of the bill, and responding to said interrogatories, a portion of which responses was excepted to.

A second amended and supplemental bill was filed on the

8th of December, 1890, in which the state of West Virginia was plaintiff and Samuel Eddy and others were defendants, stating that said lands were returned delinquent for the years 1887 and 1888 in the name of Samuel Eddy, and sold in December, 1889, by the sheriff of Lincoln county, and were purchased at said sale by one J. S. Clark; that said Clark was a confederate of said Samuel Eddy and those mentioned in the original bill as in conspiracy with said Sands in the fraudulent combination therein mentioned to hinder, delay, and defraud the plaintiff in the collection of back taxes in said bill sought to be recovered, and that said purchase was made with means furnished directly or indirectly by or on behalf of the conspirators mentioned in the original bill, and for the purpose of interposing another tax deed between the plaintiff and its said lien, and that it was the purpose of said Clark, as soon as the time expired, to obtain a deed for said land. Several interrogatories were propounded to said Clark, and the plaintiff prayed that said tax purchase by said Clark be declared a redemption of said land and in fraud of the rights of the plaintiff, and that the said Clark be restrained from applying for or demanding a deed for said land on account of the said purchase, and that the clerk of the county court be restrained from making such deed to him, or any deed, on account of said purchase, which injunction was awarded as prayed for.

A third amended and suplemental bill was filed by the plaintiff charging that on or about the 15th day of June, 1890, Samuel Eddy and his wife executed and delivered to Joshua C. Saunders a deed conveying all his interest in said lands sold in the name of William G. Sands for taxes, and that said deed from Eddy and wife has never been placed upon record in Lincoln county; that said Joshua C. Saunders was president of the Transmontaine Land Company, and the same person who bid in said lands in the name of W. G. Sands at the judicial sale made by Knight and Smith, special commissioners, and that said J. C. Saunders was one of those who aided, abetted, and helped to perpetrate the scheme set out and described in the first amended bill to defraud the plaintiff and the county of Lincoln and the districts thereof of the taxes on said lands; that J. C. Clark,

in addition to the tax sale set out in the second amended bill, has purchased the said lands, or part thereof, from the party or parties claiming to own the same, and that said purchase was made from either Frederick Prentice, Howell Smith, or Joshua C. Saunders or from one or more of them in connection with one or more parties, or from one or more parties whom said defendants or one of them represented; and several interrogatories were propounded to the defendants, Samuel Eddy, Frederick Prentice, Howell Smith, and Joshua C. Saunders.

Several depositions were taken and filed in the cause, and on the 9th day of April, 1894, a decree was rendered therein, in which it was held that at the time of the alleged tax sale in November, 1885, to the defendant Samuel Eddy, the taxes on the land in the bills described were, as therein alleged, due and unpaid for the years 1879, 1880, 1881, and 1882, in addition to the taxes for the years 1883, and 1884, for which said lands were certified by the auditor for sale in 1885; that the owners of said lands from whom said taxes were due for said years from 1879 to 1884, inclusive, allowed said lands to be offered for sale for said taxes for the years 1883 and 1884 for the purpose and with the intent of avoiding the payment of the taxes thereon due for the years 1879 to 1882, inclusive, and that said Samuel Eddy, in attempting to purchase said land at said sale in November, 1885, acted at the instance and by the procurement and for the benefit of said owners, and for the purpose of avoiding the payment of said taxes for the years from 1879 to 1882, inclusive; that the alleged tax purchase of the said Eddy in the said year 1885, and the alleged tax deed thereafter made to him on account of said purchase, were in fact by and to said owners of said land, and in their behalf, and were in law and in fact a redemption by said owners from, and a payment by them of, the taxes for the years 1883 and 1884, and did not discharge or affect the liens upon said lands of the state, the county of Lincoln, and the several districts thereof for the unpaid taxes for the years 1879 to 1882, inclusive; that the tax sale of said land to the defendant Joseph S. Clark was null and void for the reasons set out in the amended and supplemental bill to the third

supplemental bill, and that a redemption from said tax sale was duly made by the state of West Virginia by the payment of the sum of seven thousand, nine hundred and eighty two dollars and forty cents to the clerk of the county court of Lincoln county, and that a redemption of said tax sale was also made by the defendant Frederick Prentice by the contract of sale entered into by him with the trustees of the Prentice Coal & Land Association, before referred to, and by the consummation of said contract of sale; and that the said lands were liable to sale to satisfy and pay the taxes aforesaid due thereon for the years 1879 to 1882, inclusive, and for the unpaid taxes due thereon for any year or years subsequent to the year 1884, with the interest thereon as allowed by law; and referred the cause to a commissioner to take and state an account showing the amount of taxes, damages, interest, and costs due on said lands for the years from 1879 to 1882, inclusive, and for the years subsequent to the year 1884; and from this decree an appeal was applied for and obtained by Samuel Eddy, Frederick Prentice, Joseph S. Clark, and Arthur C. Denniston, E. W. Ilsley, and S. W. Colton, Jr., trustees.

In determining the questions raised in this case the Court is required, as it has been in former cases, to seek among the circumstances appearing in the record a response to the question raised as to the existence of fraud in the purchase made by Samuel Eddy at the tax sale in November, 1885, and by Joseph S. Clark in the year 1889.

Fraud, like crime, seeks concealment, and its sinuous track is many times only discovered under the search light of surrounding circumstances. The language we quoted from Story, J., in the case of *Reilly* v. *Barr*, 34 W. Va. 107, (11 S. E. 750) is so pointed and appropriate that we may be pardoned for again using it: "Fraud or no fraud is generally a question of fact to be determined by all the circumstances of the case. Direct proof of positive fraud in the various kinds of covinous alienations which we are to discuss is not, as we shall presently see, generally attainable; nor is it vitally essential. The fraudulent conspirators will not be prompted to proclaim their unlawful intentions from the housetops, or to summon disinterested parties as wit-

ness to their nefarious schemes. The transaction, like a crime, is generally consummated under the cover of darkness, with the safeguard of secrecy thrown about it. Hence it must be scrutinized and judged of by all the surrounding circumstances of the case. The evidence is almost always circumstantial. Nevertheless, though circumstantial, it produces conviction in the mind often of more force than direct circumstances." Among the circumstances disclosed by the testimony in this case which point unmistakably to an effort on the part of the owners of the land in controversy to take advantage of the mistake of the auditor, and rid themselves of the payment of the taxes thereon from the year 1879 to 1882, inclusive, we may call attention to the fact that Howell Smith, receiver of the Transmontaine Land Company, borrowed fifteen thousand dollars from William G. Sands to pay the taxes due on said tract of land prior to the year 1879; and when said land was sold under a decree of the United States court to pay off said sum with its accrued interest (which was adjudged a first lien thereon) J. C. Saunders, the president of the Transmontaine Land Company, purchased the same as the agent of William G. Sands, and at that sale Special Commissioners Knight and Smith gave notice that it was sold subject to the taxes due thereon, and that no taxes were to be deducted from the purchase money, and said special commisioners reported that the taxes on said land had not been paid since 1878. This sale was confirmed, and a deed made in pursuance of the terms thereof. The sale by these special commissioners was made on the 17th day of October, 1883, and on the 9th day of November, 1885, said land was sold by the sheriff of Lincoln county for the taxes delinquent thereon for the years 1883 and 1884, and thus notice to the agent, Saunders (who was also president of the Transmontaine Land Company) was notice to William G. Sands, the purchaser. Said land company, through its president and other officers, must have been cognizant of the fact that a mistake had been committed in certifying said lands for sale to the sheriff of Lincoln county, and in advertising the same only for the years 1883 and 1884, since no one knew better than they did that the taxes for the four preceding years

had not been paid. Said Joshua C. Saunders gave Samuel Eddy information as to the amount of taxes for which the land was advertised, and handed him a slip from the Lincoln Clipper containing the advertisement. Said Samuel Eddy held twenty six bonds of the Transmontaine Land Company for the account of said Joshua C. Saunders, and Samuel Eddy states in his testimony that said Saunders had very full charge of the matter after he purchased the land at the tax sale; that said Saunders had charge of the tax matters, and was more familiar with them than he was. The testimony shows that the relations existing between said J. C. Saunders and Samuel Eddy were extremely intimate and confidential. They had extended accounts with each other. Mr. Eddy states that some times Mr. Saunders owed him considerable money, and at other times he owed Saunders considerable, and they had relations of that kind for many years. It was then very natural that said Saunders should select Mr. Eddy, if he, as president of said company, was seeking some confidential and reliable friend to buy in the lands of said company at the delinquent sale; and his confidence appears not to have been misplaced, for said Eddy states that he deeded the land so purchased to Saunders, and, when asked if the deed executed by him to Saunders set out the real consideration, replied : "I could not say as to that. I don't even remember the amount ; and, if I did, I should not be able to tell." Can it be that the transfer of one hundred thousand acres of land was a matter of such minor importance, and the consideration received made so slight an impression on his mind, that he was unable to recall it? He does, however, state that he was reimbursed for the money he had spent in the matter, and a small amount over. The profit in the transaction was very slight. And in reply to another question he says: "The whole thing, at the time I made the conveyance—all the expenses, including payment of taxes and all that kind of thing—were all estimated, and made a part and parcel of the consideration of the sale to Saunders. He had charge of the matter." Again, Samuel Eddy was asked, "At the time of said settlement and the determination of the consideration to be received by you for making the convey-

ance to Saunders, how was the amount of the considera-
tion paid?" and replied, "I don't remember," and, when
pressed to know if he had no recollection on that subject
whatever, answered, "None, for I may have owed Saund-
ers fifty thousand dollars, or he may have owed me:" and,
when asked if he and Saunders were accustomed to have
business transactions of such magnitude that the balance
might be fifty thousand dollars on either side, stated that
they both borrowed money from the banks, and both kept
accounts at the same time, and "he used my name and I
used his whenever it was necessary;" so it was a kind of
account between them.   This being the case, it is naturally
suggested to one seeking the motives that actuated the par-
ties that there was really no necessity that J. C. Saunders
should call the attention of Samuel Eddy to the advertise-
ment of the land in the Lincoln Clipper, and that he could
have purchased it with the same facility that Samuel Eddy
did; and the fact that said Eddy did purchase the same
under the circumstances clearly indicates that J. C. Saund-
ers, as president of the Transmontaine Land Company,
wished to avoid the legal effect of purchasing said land
himself at said delinquent sale by using the said Eddy to
make the purchase for him.   No one was better aware of
the mistake committed by the auditor in failing to certify
down the delinquent taxes chargeable on this land for the
years from 1879 to 1882, inclusive, than were the officers of
the Transmontaine Land Company, for they knew they
had failed to pay the taxes on the land for those years; and
Saunders, the president, had express notice at the time he
purchased from Knight and Smith, special commissioners,
for W. G. Sands; and when the advertisement appeared
offering the land for the taxes for the years 1883 and 1884
the idea was suggested to the owners of said land to pur-
chase the same through a third party, and defeat the state
in the collection of the large amount of taxes remaining un-
paid for the four years next preceding the year 1883.

In this record we are also confronted with the unusual
and unprecedented circumstance of the Transmontaine
Land Company, through its officers and bondholders, seek-
ing to sustain as valid a tax sale of its property which is

shown by the proof to have been sold for about one thirty seventh part of its value. Section 15 of chapter 31 of the Code provides that the owner of any real estate so sold, his heirs or assigns, or any person having a right to charge such real estate for a debt, may redeem, *etc.*

At this point we may call attention to the relation existing between several of the parties to this suit and the Transmontaine Land Company. Joshua C. Saunders, as we have seen, was its president, and for some reasons held 26 bonds of the Transmontaine Land Company in the name of Samuel Eddy. Mr. Frederick Prentice seems to have been closely connected with the business of the Transmontaine Land Company, held a considerable number of its bonds, and brought the suit to foreclose the mortgage; and Joseph S. Clark in his deposition says: "I considered Mr. Prentice worth a great many hundreds of thousands of dollars, and that his warrant was perfectly good." Frederick Prentice seldom comes to the front in this case, but he nevertheless appears to have taken an active part in the defence of the same. Joseph S. Clark, in his deposition, in answer to question 100, says: "I represented Mr. Prentice [in this suit] and I am the general attorney of Messrs E. W. Clark & Co., and for them have consented to certain proceedings therein because I knew they would not deny my right to do so; but I have no instructions from them, nor authority to represent them in this suit, or any one else except Mr. Prentice. I have, however, seen Mr. Eddy, and prepared an answer for him; but he takes no personal interest in the suit, and I have done this for him as attorney for Mr. Prentice." Can it be regarded in any other light than significant that Prentice should feel more interest in this suit than Eddy, the purchaser at the delinquent sale? E. L. Buttrick was, and for some time had been, the attorney for Frederick Prentice, previous to said delinquent sale in 1885, in looking after the land in controversy; and it taxes our credulity to a considerable extent to ask us to accept as true the statement that said E. L. Buttrick merely upon the receipt of a telegram from Samuel Eddy, without any previous conference or understanding with Prentice or Saunders, would proceed at once

to Lincoln court-house, and purchase the land at this de-
linquent sale.   Said Buttrick appears to have been at that
time an attorney of experience and prominence ,and Freder-
ick Prentice states, in answer to the tenth interrogatory,
that "after the purchase by the said Sands, he, as the agent
of said Sands, employed said Buttrick to represent the in-
terest of said Sands in the matters concerning the settle-
ment of conflicting titles to said lands, and to bring suits
against trespassers and parties cutting and removing the
timber; and at the time of the purchase by the said Eddy
at the tax sale in the fall of 1885 he still looked to the said
Buttrick as his counsel and adviser in said matters."   The
purchase, however, was made, and Sands never was heard
to complain.   He had purchased subject to the taxes due
for the four years next preceding 1883, and, if the sale to
Eddy was sustained, it would relieve the land of the large
amount of taxes which were a lien thereon for said years;
and the silence of Sands under the circumstances is accoun-
ted for by the statement of Frederick Prentice in his
answer to the eighth interrogatory that "since the sale of
the said lands by Special Commissioners Smith and Knight
this defendant has had a contingent interest in said lands
under an arrangement with Wm. G. Sands, and when he
was subsequently negotiating the sale of said lands he in-
formed J. S. Clark that he owned or controlled the title to
this land."   Again, said J. S. Clark, in response to the
fifty seventh question, "Did you not know at that time
[meaning when the tax deed was made to Eddy] or had
you not been informed, that at the time these lands were
sold for taxes to Eddy that said Prentice was managing the
same, and had Col. E. L. Buttrick employed as his attor-
ney or agent in West Virginia?" says, "I do not remember
how many of the details of the management of the lands
and the tax sale at which Eddy bought I knew at that
time.   Prentice sold the land to Colton and others, trus-
tees.   I do not think I then knew that Mr. Prentice was in
charge of the land, nor that Col. Buttrick was his attorney,
but I must have learned these facts pretty soon after this;
and it may be I knew them then."   Again, while the
strict letter of the law may have been complied with by

publishing the notice of the delinquent sale in the Lincoln Clipper, it is a matter of serious conjecture how a copy of a paper of its limited circulation could have reached the city of New York, and found its way into the hands of the president of the Transmontaine Land Company, without the aid of some such friendly hand as that of Col. E. L. Buttrick, the attorney of Prentice and Saunders, the president of said company, who was on the ground and intrusted with the protection of its interests. Again, was the conduct of Samuel Eddy subsequent to the purchase of the land consistent with that of a *bona fide* purchaser? He was unable to state the amount of tax he had paid on the land after he had obtained the tax deed, but says he paid it for one or two years; and, when pressed for a definite answer, stated that he did not believe he could give any idea as to the amount he paid, but thinks he paid this tax through Mr. Saunders. "He attended to those taxes for me." He used Buttrick. He was also asked if he had any further correspondence with Buttrick about the payment of taxes, or any other question connected with the land, after he was notified of the purchase, and replied he either had with him direct, or instructed Saunders to have. "Mr. Saunders had very full charge of the matter." And when interrogated as to whether he would object to said Buttrick exhibiting all correspondence that passed between himself and Buttrick or Saunders and Buttrick, replied, "I think I would object to it, but still I might not;" the evidence clearly indicating that said Eddy paid no attention to said land after he purchased it, and that Saunders, who had full charge of the matter, allowed it to be returned delinquent after the first year. Samuel Eddy never saw the land before he purchased it, and, so far as the evidence discloses, never saw it afterwards. He purchased in 1885. It was returned delinquent again for the years 1887 and 1888, and was sold by the sheriff in 1889, when J. S. Clark became the purchaser, who says in his deposition: "It was understood that I should secure a tax deed in pursuance of my purchase at the tax sale, and convey said tax title to Colton *et. al.*, trustees; and the reason for this understanding was in order to cure any defects or questions of title

that could be cured or settled by the tax sale and deed."
Frederick Prentice told J. S. Clark that he owned or con-
trolled this title before the sale to Colton and others, trus-
tees; and when he contracted the sale to them of one half
of said property for one hundred and twenty five thousand
dollars, reserving to himself the other half of the same, and
it became necessary to call in the title, he made his words
good.   Eddy at once conveyed to Saunders, and received
in consideration about what he had paid out for taxes, *etc.*,
and seems to have been entirely ignored by Prentice in
making the sale.   Another deed was made to Saunders by
the heirs of Sands.   Saunders then deeds it to Prentice,
who deeds it to said trustees; and at this point another sig-
nificant circumstance suggests itself.   Sands was dead, and,
if the tax deed made to Eddy conferred title on him, it
had the effect to extinguish the title of Sands, which was
expressly acquired subject to the unpaid taxes; and yet the
evidence shows that the heirs of Sands got consideration
for their deed, and shared in the proceeds of the sale.
These facts and circumstances can lead to no other conclu-
sion than that Frederick Prentice and J. C. Saunders used
Samuel Eddy for the purpose of taking advantage of the
mistake made by the auditor in omitting to certify said
land for sale for the four years next preceding the year
1883, and with full knowledge that said taxes had not been
paid for said years, and that the purchase made by Eddy
was merely a purchase made by the Transmontaine Land
Company, and only constituted a redemption of the land
for the years 1883 and 1884.

The appellants contended that the purchase made by
Eddy at the tax sale was a civil contract made by him with
the state, and that he became clothed with every right and
immunity conferred upon such purchasers by the statutes of
the state in force at the time of his said purchase, and it
was not in the power of the state by subsequent legislation
to in anywise alter or impair said contract, either directly
or by prescribing new methods of procedure by which it
could assault said contract, not then in existence; and cite
and rely on *Forqueran* v. *Donnally,* 7 W. Va. 134, *etc.*   If,
however, the conclusion we have reached from the testi-
mony in the case that Samuel Eddy, in making this pur-

chase, was the mere instrument of Frederick Prentice, J. C. Saunders, and his associates, representing the Transmontaine Land Company, be correct, then the consequence follows that the purchase made by the agent, Eddy, was a purchase made by the principal, and resulted merely as a redemption of the land, and conferred upon said Eddy no right to demand a deed under the statute. Where a purchase is made at a delinquent sale by the owner or his agent for the amount of the tax due on the land, or, as in this case, for less, the purchaser simply says to the state, "I will pay you what I already owe you, or less, if you will deed me the land," no consideration passes, and no title passes. Upon this proposition Black on Tax Titles (section 276) states the law thus: "It is a general rule that a person who, by reason of his legal or moral duty to pay the taxes on given land, is disqualified from purchasing the same directly at a tax sale, can not acquire any valid title thereto indirectly by procuring another person to figure as the ostensible bidder at the sale, and then taking an assignment of the certificate or deed from such person on refunding him the money expended. Such an arrangement, if not positively fraudulent, is at any rate an attempt to evade the law, to which the courts will lend no countenance. * * * And a parol contract by which a person agrees to purchase lands at tax sale, and convey them to the owner on being repaid the amount paid at the sale, with interest, can not create a valid trust, nor operate as a mortgage, and will not be enforced in equity." Cooley on the Law of Taxation (on page 346) thus states the law: "There is a general principle applicable to such cases that a purchase made by one whose duty it was to pay the taxes shall operate as payment only. He shall acquire no right as against a third party by a neglect of the duty which he owed to such party. This principle is universal, and is so entirely reasonable as scarcely to need the support of authority. Show the existence of the duty, and the disqualification is made out in every instance."

Now, it appears that although Sands purchased the land at the commissioner's sale, Prentice held a contract for the title thus acquired by him, and Eddy acted as the agent of

Prentice and Saunders in making the purchase, and immediately turned the entire management of the lands, payment of taxes, *etc.*, over to Saunders, who was president of the Transmontaine Land Company, and paid no more attention to the matter, and, as was shown by the testimony of J. C. Clark, he took no personal interest in this suit; and said Clark says he prepared an answer for said Eddy, and did this for him as attorney for Mr. Prentice, which is another potent circumstance detracting from the *bona fides* of the purchase of said land at the tax sale by Eddy. If the defendants had been disposed to cast aside duplicity, and deal openly in making their defence, there can be little doubt that the depositions of Prentice, Saunders, and their confidential agents could have thrown a flood of light on the intricate windings of this case which the Court is compelled to grope for and follow in the light of circumstantial evidence, and the fact that the witnesses so familiar with the transaction and motives of the parties are withheld from the stand can not be regarded as consistent with fair dealing and honest purpose. It is urged by the appellants that at the time of said sale there was no method prescribed whereby the state could assault a tax deed made by her on account of a tax sale for irregularities or otherwise, and that a statute was enacted in 1887 to authorize such a procedure, under which this suit was brought; and it is contended that said act could only apply to sales made after such legislation took effect. Upon this question Cooley on Constitutional Limitations (in section 373) cites the case of *Hepburn* v. *Curts,* 7 Watts, 300, where it was said : "The legislature, provided it does not violate the constitutional provisions, may pass retrospective laws, such as in their operations may affect suits pending, and give to a party a remedy which he did not previously possess, or modify an existing remedy, or remove an impediment in the way of legal proceedings." And in section 382 the author says : "But the healing statute must in all cases be confined to validating acts which the legislature might previously have authorized, * * * and even in judicial proceedings, if there was originally a failure of jurisdiction, no subsequent law can confer it. In the case under consideration, how-

ever, there was nothing to deprive the court of jurisdiction." And again, in section 373, the author quotes from a Pennsylvania case as follows: "Whenever there is a right, though imperfect, the constitution does not prohibit the legislature from giving a remedy." *Schenley* v. *Com.* 36 Pa. St. 29. Can any one doubt that, if an advantage had been taken of the mistake of the auditor to defraud the state out of four years' taxes on this immense body of land, and the law as it then existed provided no remedy, the legislature had the right to pass a law providing a remedy in such case? Certainly not. Such a law could have been properly passed before the acts complained of occurred, and, being remedial in its nature, was properly passed afterwards.

As to the sale made by the sheriff to J. S. Clark, section 29 of chapter 31 was in force at that time, giving the state the express right to assault a tax sale for any defects of which the owner might avail himself. No deed has ever been made to said Clark by the clerk of said county court, and the affidavit of the sheriff, appended to the list of sales of real estate for the years 1887 and 1888, is defective, containing precisely the same defect as did the affidavit in the cases of *Jackson* v. *Kittle,* 34 W. Va. 207 (12 S. E. 484) and *Hays* v. *Heatherly,* 36 W. Va. 613 (15 S. E. 223); and, besides, the state redeemed the land from this sale by depositing the money with the clerk; and again, it is manifest that this purchase was made by Clark under an understanding with said Prentice to cure any defects that might be shown in the purchase made by Eddy, as said Clark states in his deposition when asked what understanding he had with Prentice as to what he should do with his tax purchase, that "It was understood that he should secure a tax deed in pursuance of his purchase at the tax sale, and convey said tax title to Colton and others, trustees; and the reason for this understanding was in order to cure any defects or questions of title that could be cured or settled by the tax sale or deed"—showing conclusively the object of said Prentice, and that he was seeking to deprive the state of four years' taxes on said land by the same scheme which had been practiced by Eddy. It is but fair to said

Clark, however, to state that at the time he made his pur-. chase at the tax sale in 1889 he had no knowledge of the pendency of this suit, nor of the claim of the state for these taxes, nor that such claim existed.

The appellants also rely on that portion of the statute (c. 31 s. 4, Code) which says: "But if the real estate has been sold for the non-payment of taxes, the same shall not be charged with or again sold on account of any tax for any years previous to that for the taxes of which the same was made." This statute surely was not intended to cover a case like the one under consideration, where the land is purchased at the sale by the owner or his agent, and only amounts to a redemption. 1 Blackw. Tax Titles, § 566, says: "There is a class of frauds now to be noticed which includes purchases made by those who are bound by covenant or upon legal or equitable principles to pay the taxes and yet suffer the land to go to sale for the purpose of acquiring a title against the owner under whom they claim the possession, or to whose title they are in some manner privy. Some cases hold that any person who is not under a legal obligation to pay the taxes may be a purchaser, but the better opinion is that one who holds a position of trust or confidence in reference to the subject of sale, or has a duty to perform which is inconsistent with the character of a purchaser, can not buy. If any one who has a right to redeem becomes a purchaser at a tax sale, it is merely a payment of the taxes. Any obligation, legal or moral, to pay the taxes, will prevent the accruing of a valid tax title." Now, under section 15 of chapter 31 of our Code, "the owner of any real estate so sold, his heirs or assigns or any person having a right to charge such real estate for a debt, may redeem, *etc.* Samuel Eddy, as trustee for J. C. Saunders, held certain bonds of the Transmontaine Land Company, and as such trustee had a right to charge this real estate with the debt of his *cestui que trust*, even if he was not, as the evidence shows, as I think, clearly, purchasing the land as his agent, and therefore he could acquire no title by purchasing at said sale. So in the case of *Christy* v. *Fisher*, 58 Cal. 256, it was held that one who is under a moral or legal obligation to pay the taxes is not in a posi-

tion to become a purchaser at a sale for such taxes, and, if such person permits the property to be sold, and buys it in, either in person or indirectly, through the agency of another, he does not thereby acquire any right or title to the property, but his purchase is deemed a mode of paying the taxes. And in the case of *Moss* v. *Shear*, 25 Cal. 38, it was held that: "One who is under any legal or moral obligation to pay taxes can not, by neglecting to pay the same, and allowing the land to be sold in consequence of such neglect, add to or strengthen his title, either by purchasing at the sale himself or sufferieg a stranger to buy, and then purchasing from him." In the the case of *Bowman* v. *Eckstien*, 46 Iowa, 585, cited by counsel for the appellee, it appeared that land had been sold in 1870 for the taxes of 1869, but by mistake of the officers the unpaid taxes for a number of prior years were omitted. The purchaser, Estes, bought in good faith, without knowledge of the mistake. Subsequently other parties took a conveyance of the land from the owner, and then bought in the tax certificates of Estes for the purpose of getting a tax deed thereon, and thus cut out the omitted taxes. The court held that under the circumstances the unpaid taxes could still be enforced against the land. In the opinion the court uses the following language: "It certainly can not be claimed, if the owner of land should purchase the same at a tax sale, where part of the delinquent taxes were by mistake omitted from the sale, or redeem from a sale made to another, that this would operate as a discharge of prior delinquent taxes omitted from the sale by mistake."

These authorities appear to me to propound correctly the law bearing upon the questions presented by this record, and, applying the principles therein indicated to the facts disclosed, I am led to the conclusion that there is no error in the decree complained of, and the same is affirmed, with costs, and the cause is remanded.