# CHARLESTON.

STOCKTON *et al. v.* CRAIG *et al.*

Submitted November 15, 1904. Decided December 13, 1904.

1. TAXATION.—*Power of Assessor and Clerk of County Court Over Land Books.*

Section 10, chapter 54, Acts 1875, as amended and re-enacted by section 10, chapter 73, Acts 1879, as amended and re-enacted by section 10, chapter 12, Acts, 1881, and now in force, as section 10, chapter 29, Code, authorize the assessor or the clerk of the county court, to restore to the land books, at the instance of the owner, any lands omitted therefrom by reason of a sale to the state for delinquent taxes, if such sale is for any cause illegal and invalid, within five years from the time such lands are omitted from such books; and the failure of the owner to have such lands so restored to the proper books within such

time subjects them to forfeiture under section 6, article XIII, Const., and section 39, chapter 31, Code.  (p. 473).

2.  CLOUD ON TITLE.—*Party Suing to Remove Must Have Title.*
    A suit to cancel alleged fraudulent and void decrees and deeds as a cloud upon title to land cannot be maintained by those having no present interest in or title to such land, either legal or equitable.  (p. 475).

3.  TAXES.—*Payment Under Void Tax Deeds Does not Prevent Forfeitures.*
    The payment of taxes by adverse claimants of land under fraudulent and void tax decrees and tax deeds, does not inure to the benefit of the delinquent owner so as to prevent the forfeiture of his title, for non-entry on the land books.  (p. 475).

Appeal from Circuit Court, Nicholas County.

Bill by Charles Stockton and others against James S. Craig and others.  Decree for defendants and plaintiffs appeal.

*Affirmed.*

E. B. DYER and PRICE, SMITH & SPILLMAN, for appellants.

ALDERSON & HORAN and BROWN, JACKSON & KNIGHT, for appellees.

DENT, JUDGE:

Charles Stockton and others claiming to be the heirs at law and legal representatives of Aaron Stockton, John B. Clopton, Wm. E. Clopton, Zachariah Lewis and Sarah Ann E. Foster, appeal from a decree of the circuit court of Nicholas county, dismissing a bill of review filed by them for errors of law in a certain suit in chancery in said court finally determined, wherein they were plaintiffs and James S. Craig and others were defendants.

The two errors relied on are, first, that the court decided the original suit contrary to law; second, that the court refused to continue the case to permit the plaintiffs to take depositions. If the circuit court was right as to the first proposition, the second becomes wholly unimportant.  The undisputed facts are as follows:

"By three several patents, all bearing date on the 30th day of August, 1845, the Commonwealth of Virginia granted to Aaron Stockton, John B. Clopton, Wm. E. Clopton, Zachariah Lewis,

and Sarah Ann E. Foster, three several tracts of land contain-
ing one thousand one hundred and eighty-three and one-fourth
acres, each, situate in Nicholas county. The said three tracts
of land were entered on the land books of said county in the
names of said patentees in the year 1846, and remained so
charged for each and all the years from that date until the year
1881, except for the year of 1853, for which year they were
omitted from said books, but in the year 1854 were again re-
entered and charged to said parties, on said books, with the
memorandum, "Re-entered by Auditor's receipt produced," and
all the taxes for said years, to-wit: From 1846 to 1861, were
paid by said patentees. There are no land books for the county
of Nicholas, either in the county clerk's office of said county, or
in the Auditor's office, for the years 1861, 1862, 1863 and 1864.
For the year 1865 said three tracts of land were charged on said
land books in the names of said patentees and remained so
charged for the years 1866, 1867 and 1868. From the years
1869, 1870, 1871, 1872, the said three tracts were omitted from
said land books. In the year 1873 these said three tracts of land
were all again entered on the said books in the names of the
patentees, and charged with the back taxes for nine years, and
said three tracts of land remained so charged upon the said land
books in said names for the years 1874, 1875, 1876, 1877 and
one of said tracts for the years of 1878 and 1879. For the year
1874 said three tracts of land were returned delinquent, and
were certified by the Auditor to the sheriff of Nicholas for sale
in 1875, but were redeemed from said sheriff before the sale
by the payment of the taxes for the year 1873 and the back taxes
for the nine years prior thereto and the taxes for the year 1874.

"John M. Hutchinson, commissioner of school lands in said
Nicholas county, filed his petition in the circuit court of said
county, on the 9th day of August, 1875, in which he set out the
granting of these three tracts of land of one thousand one hun-
dred and eighty-three and one-fourth acres each, by the Com-
monwealth of Virginia as aforesaid, and averred in said petition
that said tracts of land were transferred to the said grantees
and regularly charged with the taxes chargeable thereon, first
on the land books of Nicholas county for the year 1846 and
regularly, for succeeding years down to and including the year
1866, but that the assessors' land book for the year 1867 does
not show any charge or assessments of taxes on the first of the

said tract of land, and that said tract was dropped from said books, and has not been charged with the taxes thereon for any year or years since the said year 1866, and that the other of the said tracts of land were charged on said books up to and including the year 1868, and that the said two tracts of land were dropped from the land books of the said county for the year 1869 and are not charged with any taxes thereon for any year since that time. The said petition further falsely stated, as is apparent on the face of the record and beyond all contradiction, that said three tracts of land were sold and purchased on behalf of the State of West Virginia in the years 1850, 1855 and 1860, and were never redeemed from said sales. The certificates of the Auditor and of the Clerk of the county court exhibited with the bill and the answers show beyond controversy that said allegations of the petition were false and altogether without foundation, and that there never was any sale of said three tracts of land or any of them to the State of West Virginia. The petition further falsely alleged "that for five successive years after the year 1869, to-wit, for the years 1870, 1871, 1872, 1873, 1874, the owners of the three tracts of land have not been charged with any state or other tax thereon, nor has any state tax been charged on either of said tracts, for any one or more of said years on any part of said land on the land books of Nicholas county aforesaid, that the said three tracts of land are forfeited to the State of Virginia and are now forfeited to the State of West Virginia, and are therefore liable to be sold for the benefit of the school fund." As before stated these three tracts of land had all been re-entered on said land books in the year 1873, and charged with the back taxes and were again charged on said books for the year 1874, and this fact must have been and was well known to the defendant, James S. Craig, who has been the recorder of said county.

It is further shown by the record that this petition of John M. Hutchinson is in the handwriting of the defendant, James S. Craig, and it is charged in the bill that said Craig fraudulently entered into a combination or conspiracy with the said Hutchinson for the purpose of having the lands sold in order that he, the said Craig, might become the purchaser thereof, and thus defraud the true owners, and that he and the said Hutchinson, knowingly and falsely misstated the facts in re-

gard to the assessment aforesaid in order that by imposition upon the court a decree of sale might be obtained.

"On the same day on which this petition was filed, to-wit: on the 9th day of August, 1875, an order was entered by the said circuit court directing said Hutchinson, school commissioner, to make sale of said three tracts of land with direction to have same surveyed before such sale. It further appears from the record that said Hutchinson at once advertised said lands to be sold on the 12th day of October, 1875, at which sale the defendant, James S. Craig, became the purchaser of lot No. 6 of 200 acres, lot No. 7 of 267 acres, lot No. 8 of 186 acres, lot No. 10 of 111 acres, lot No. 11 of 630 acres, lot No. 15 of 300 acres, lot No. 16 of 500 acres, at the aggregate price of $156.50; and that Joseph Rader, assignee of M. L. Rader, became the purchaser of lot No. 1 of 261 acres, lot No. 2 of 130 acres, lot No. 3 of 146 acres, at the aggregate price of $124.50; and that Joseph Rader and A. F. Rader became the purchasers of lot No. 4 of 218 acres, lot No. 5 of 130 acres, at the aggregate price of $127.50; and that A. F. Rader became the purchaser of lot No. 12 of 180 acres, lot No. 13 of 225 acres, and lot No. 14 of 137½ acres at the aggregate price of $35.28. By a decree entered on the 7th day of August, 1876, the report of said sales and said sales were confirmed and said commissioner directed to execute deeds to the purchasers for the lots purchased by them respectively upon the payment of the whole of the purchase money. By deed dated the 13th day of March, 1877, said John M. Hutchinson, commissioner of school lands, conveyed to the defendants, James S. Craig and John S. Conner, (it being stated in said deed that Craig had assigned to said Connor half of the lands purchased by him) the lots of land out of these three tracts of one thousand one hundred and eighty-three and one-fourth acres each, purchased by said Craig as aforesaid, with the statement in said deed that said three tracts of land had become forfeited and delinquent to the State. By deed dated the 5th day of January, 1891, James S. Craig, describing himself as former commissioner of school lands, conveyed to the defendant, M. L. Rader, the whole of lots Nos. 1, 2 and 3, and the undivided one half of lots Nos. 4 and 5; the deed stating that Joseph Rader had directed the conveyance to be made for the lots purchased by him to the said M. L. Rader. This deed

expressly excepts and reserves from the operation thereof 'one-half undivided of said lots No. 4 of said 218 acres and No. 5 of said 130 acres,' which reserved and excepted two lots were purchased by A. F. Rader and duly confirmed to him by the decree of confirmation last aforesaid. That the foregoing are the only deeds ever made, and it does not appear in the record that any deed was ever made to the said A. F. Rader for the undivided half of said lots Nos. 4 and 5; nor any deed to the said A. F. Rader for lots Nos. 12, 13 and 14.

"It further appears from the record that said lots Nos. 1, 2, 3, 4, and 5 were never entered upon the land books in the name of the said Raders or any of them, or any person claiming under them, until after the making of said deed of January 5th, 1891; nor were any taxes paid by them upon any of said lands until the year 1891; in other words, although said lands were claimed to have been purchased in 1875 and the sales confirmed in 1876, none of said lots were charged to said purchasers or any taxes paid thereon from 1875 to 1891, a period of sixteen years. It further appears from the record that said lots Nos. 12, 13 and 14 claimed to have been purchased by A. F. Rader in 1875 were never entered upon the land books or charged with taxes in his name or any taxes paid on the same or any one of them. And there is nothing in said record to show that said A. F. Rader ever did comply with the terms of the sale by the payment of the deferred payments for said last mentioned lots. It further appears from the record that the order of sale of August 9th, 1875, directed the notice of sale to be published in the Greenbrier Independent, a newspaper published in the town of Lewisburg; and also to be posted at the court house door of Nicholas county and at least four of the most public places in said county, for thirty days next preceding the sale; and that the commissioner was directed to have proper surveying done, and that the plat and description of each tract surveyed returned with his report. It does not appear in the record that the notice was ever posted at the court-house door or anywhere else in Nicholas county, but it was published in the Greenbrier Independent. A copy of the notice so published is found in the record stating that the sale would be had 'at public auction in front of the court house door in Nicholas county, West Virginia, on Tuesday, the 12th day of October, 1875.' In that

notice no intimation was given that said lands would be sold in lots or parcels, but a statement was made that three tracts of one thousand one hundred and eighty-three and one-fourth acres each, would be sold. The order entered on the 7th day of August, 1876, confirming the sales of the lots to Craig and the Raders, states that these lands were sold 'in front of the court-house door of said county on the *11th* and *12th* days of October, 1875.' notwithstanding said three tracts were advertised to be sold on the *12th* day of October, 1875, and the deeds made to defendants Craig and M. L. Rader, both state that such sales were made on the *11th and 12th* days of October, 1875. It thus appears that the sales actually took place one day in advance of the date stated in the public notice. It is further shown by the record that these three tracts of land were returned in the name of the said patentees for the years 1875 and 1876, and were certified by the Auditor for sale in 1877, and were sold for said taxes on October 10th, 1877, and were purchased by the sheriff of said county for the state of West Virginia, and were subsequently certified by the Auditor to the Clerk of the Circuit Court of Nicholas county, as required by law, to be sold for the benefit of the school fund. And that for the year 1877, said tracts of land were returned delinquent and were sold for such delinquency by said sheriff on October 28th, 1879, and purchased by the defendant, J. S. Craig; but no deed was ever obtained by said Craig under said sale, and therefore he obtained no right thereunder. It is further shown by the record that the report of the sale in 1877 for the taxes of 1875 and 1876 aforesaid was not returned by the sheriff within the time required by law."

The statement of facts so far is taken from the brief of counsel for appellants. The following additional facts appear from the record: That after the purchase of said lands at the sheriff's sale on October 28th, 1879, for the taxes due thereon for the years 1877 and 1878, C. I. Lewis, representing the plaintiff's title and interest offered to redeem the lands from Craig to which Craig consented and tendered him a receipt therefor as follows: "Received May 18th, 1880, of C. I. Lewis twenty-eight dollars and 85 cents taxes and interest to this time at the rate of 12 per cent. on three tracts of land of 1183½ acres each sold by the sheriff of Nicholas county on the 28th day of October, 1879, one tract for the taxes of 1877

and 1878 and the other two tracts for the taxes of 1877 and
the three tracts purchased by me for the aggregate sum of
$26.97. But this acceptance of said sum by me is not to preju-
dice the rights or title of any party or parties obtained under
a sale made by John M. Hutchinson, Commissioner of School
Lands under a decree for the sale of said three tracts of land
made by the Circuit Court of the county of Nicholas about the
year 1874." This Lewis refused to accept and deposited the
sum necessary for redemption with the clerk of the county court.
He left it there for a short time, and then withdrew it, thus
abandoning all thoughts of redemption. A portion of the
lands was continued on the tax books for the year 1879, and in
the year 1881, they were again sold for taxes. From this time
on down to the present time the lands have not been assessed
to the original patentees, a period of more than fifteen years
to the beginnig of this suit and almost twenty-five years to the
present date. During all this time the portion claimed by J.
S. Craig and J. S. Conner has been assessed in their names,
and they have paid the taxes thereon from and including the
year 1878 down to and including the present time. That said.
lands have not since been returned delinquent, but the appellees
claim that they had actual, open, notorious, continuous and
exclusive possession thereon under their purchase from the com-
missioner of school lands ratified and confirmed by the circuit
court on the 7th day of August, 1876.

The first question that demands consideration is as to whether
the plaintiffs have shown any right to maintain this suit. It is
admitted that the state purchased the lands in the year 1877
for the taxes delinquent thereon for the years 1875 and 1876,
that notwithstanding such purchase the lands remained on the
land books until the year 1879, when they were again sold for
taxes and purchased by Craig, who never obtained a deed there-
for. They were then dropped from the land books, and no at-
tempt has ever been made by plaintiffs or those under whom they
claim to restore them thereto. Thus plaintiffs' title has long
since been forfeited to the state, both by constitution and statute
for non-entry on the land books for a period of upwards of
fifteen years, unless they have shown a good legal excuse for
not making such entry. They do not claim that they ever made
any effort to redeem the lands or have such entry made, but
rest their case solely on the claim that because the state pur-

-chased these lands in the year 1877, for the taxes of the years 1875 and 1876, and that such sale was void because the sheriff failed to make his report in the time required, that such void sale excused them from making any attempt to restore their lands to the land books and that the afterward continuance thereof on the land books up until the year 1879, was also illegal and void by reason of such void sale. In short, that such sale was void to invest their title in the state but valid to suspend their title in the air and furnish them a just, equitable excuse for their total lack of diligence and regard for the just duty they owed the state for more than twenty years, beginning with their delinquency for the year 1875. Plaintiffs to sustain this contention rely on the decision of the Circuit Court of Appeals of the United States in *Sayers* v. *Burkhart,* 85 Fed. Rep. 246, which holds that "Where lands have been purchased by the state at tax sale, they cannot be forfeited for non-entry on the land books for taxation under the statute of West Virginia, which provides that lands so sold shall not thereafter be entered for taxation unless redeemed." Supported by the decision of this Court in the case of *Totten* v. *Nighbert,* 41 W. Va. 800, in which it is held that "where land has been sold for taxes and purchased for the state, and the clerk of the county court illegally places such land on the land books for succeeding years, in the former owner's name, and such land is again delinquent and sold by direction of the auditor for the taxes of such succeeding years, such sale is illegal and void, and the purchaser acquires no title by reason thereof." These decisions are both in harmony with each other, and the statute which they construe, but do not in any sense sustain plaintiffs' contention that if the sale to the state is void, the lands cannot be restored to the land books on request of the original owner in discharge of the requirements of the Constitution, and the statute. When the State once acquires the title of the land owner, either by purchase or forfeiture, its title becomes absolute, and it cannot be divested thereof in any other manner than is authorized by law. *State* v. *Swann,* 46 W. Va. 128; *State* v. *Sponagle,* 45 W. Va. 415 (32 S. E. 283) ; *McClure* v. *Mailland,* 24 W. Va. 561. No title remains in the land owner, and therefore the replacement of the lands on the land books before redemption or sale would be illegal and void. If the sale to the state, however, is for any reason illegal and void, no title passes, but the title remains in

the land owner, who is presumed to know the law, and it is his duty to take steps immediately to restore the land to the proper books, and if he fails to do so for five consecutive years, such title as remains in him is forfeited to the state.  *Simpson* v. *Edmiston,* 23 W. Va. 675.  The clerk, the assessor and the land owner are all presumed to know the law, and presumed to know when a sale is illegal and void and their ignorance of law furnishes no excuse for disobedience thereof.

It is maintained that the clerk is a mere ministerial officer, and that it is his duty under his oath to obey the plain mandate of the statute without investigating the validity or invalidity of the sale.  To the contrary, the law presumes that the clerk knows the law, and knowing it, knows when a sale is valid or invalid and must act accordingly to comply with his oath of office, and the plea of ignorance will furnish him no excuse, and will not make any illegal act done by him legal.  The clerk's ignorance cannot make that legal which is illegal, or make that illegal which is legal.  The oath he takes is "That he will support the Constitution of the United States and the Constitution of this State, and that he will faithfully discharge the duties of his said office to the best of his skill and judgment."  Though his skill and judgment may sometimes be in error, yet they cannot make law, after the manner of the errors of courts of last resort, although they may excuse him from intentional wrong.  While both the assessor and the clerk are administrative officers, and belong to the administrative branch of the state government, yet in restoring lands to the land books improperly omitted therefrom, they act judicially.

Section 10, chapter 54, Acts 1875, provides that, "When the assessor shall ascertain that there is any land in his district which has not been entered in his land book, or after being so entered, has from any cause, been omitted for one or more years, he shall make an entry thereof, and of the name of the owner  *  *  *  and shall charge the same with all the taxes which should have been charged or collected thereon since the twentieth day of June, 1863, with lawful interest thereon."  By section 10, chapter 73, Acts 1879, this section was amended and re-enacted, by adding thereto after the word "omitted" "for a period of less than five years" in lieu of "for one or more years," thus subjecting it to the constitutional limit of forfeiture; and

also omitted therefrom "since the twentieth day of June, 1863." By chapter 12, Acts 1881, the clerk of the county court is directed to make out the land books and authorized to correct any mistakes he may discover therein. Section 10, is continued in this act substantially as formerly, with the following clause added thereto: "And if the clerk of the county court make any such discovery" (that is, that any lands have been omitted therefrom for a period of less than five years) "he shall enter the same in the land books and inform the proper assessor thereof, who shall assess the same as aforesaid and certify his assessment to the clerk; and the clerk shall thereupon charge said real estate with taxes as aforesaid." This section materially unchanged has been continued to the present time. Section 10, chapter 29, Code. Thus both the clerk and the assessor in ascertaining what lands have been improperly omitted from the land books for any cause are clothed with judicial powers often nominated *quasi* judicial, and when a land owner seeks to have his land restored to the land books because illegally omitted for any cause the duty is imposed on them of investigating the grounds of illegality, and if found to be true, and forfeiture has not yet accrued, of restoring such lands with all unpaid taxes, with legal interest thereon chargeable against the same, to the land books. Thus the State is made whole, and the land owner redeems his land from delinquency and sale, and prevents forfeiture thereof.

In Welty's treatise on the law of assessment (section 25, p. 37) the law is stated as follows: "In the exercise of the functions and in the discharge of the duties of his office, an assessor acts both judicially and ministerially. That is, some of his acts are judicial and some ministerial. "When it becomes necessary to determine a question of law or fact the act is judicial." The acts of assessors in determining what property is liable to taxation are judicial in their character. Throop on Public Officers, 571; *Wheeling Bridge Co.* v. *Paul, Judge,* 39 W. Va. 142; *Cunningham* v. *Brown,* 39 W. Va. 588; *Charleston Bridge Co.* v. *County Court,* 41 W. Va. 658.

It is therefore plain that either the assessor or the clerk had authority to restore these lands to the land books on application of the owners at any time before they became forfeited by reason of non-entry, provided the former purchase by the State was illegal or void for any cause, and having the power, it was

incumbent on them as a duty to do so when thereto requested. Whatever title remained in the owners became forfeited to the State after they had been off the land books for five consecutive years. Hence, whether the sale to the State was valid or invalid the land owners lost their title, and it became absolutely vested in the State. Having no title or no suable interest in the subject matter of the suit they cannot maintain the same. *King* v. *Mullens,* 171 U. S. 404; *King* v. *Panther Lumber Co., Id.* 437. Without title either legal or equitable plaintiffs cannot attack the defendants' title papers as being fraudulent and void and creating a cloud on their lost title, since the fraud alleged had nothing to do with the loss of their title. The cancellation of defendants' papers would not restore their lost title. The rule is stated in the 17th Am. Plead. & Pract., 300, as follows: "A bill to quiet title or remove a cloud cannot be maintained by any one who is not interested in the title. The plaintiff must have some title, either legal or equitable, for it is a general rule that he must recover, if at all, upon the strength of his own title and not upon the weakness of that of his adversary. Want of title in the plaintiff renders it unnecessary to examine that of the defendant."

It is insisted that as the purchase by the defendants under which they hold was by a decree of the circuit court at the instance of the commissioner of school lands that plaintiffs are entitled to the benefit of all taxes paid by such purchasers to prevent forfeiture of their land under the decision of *Lynch* v. *Andrews,* 25 W. Va. 757, and *Sturm* v. *Fleming,* 26 W. Va. 54. These cases hold that there was such privity between the purchaser at a judicial sale and the person whose land was sold that if such sale and the deed made in pursuance thereof should thereafter be set aside that the payment of taxes by the purchaser would prevent the forfeiture of the title to the State during the period covered by such annulled sale and deed. This arises from the fact that the titles are the same, and temporarily vested in the purchaser, and as he pays the state taxes during the interim, the title cannot possibly be forfeited, but that the purchaser would have the right to reimbursement of the taxes from the owner of the land whose title is restored or freed from cloud. In the present case, there was no such judicial sale as would create or continue a privity between the origi-

nal owners and the purchasers. Such owners were not parties to the proceedings, nor were they entitled to be. *McClure* v. *Maitland,* 24 W. Va. 561. Their title was not sold, but it was only such title as the state had at that time. If any privity existed, it was between the state and the purchasers. If the State had no title, then the decree of confirmation and deeds in pursuance thereof furnished mere color for the beginning of a new title bringing this case clearly within the rule of *Simpson* v. *Edmiston,* 23 W. Va. 675; *State* v. *McEldowney,* 54 W. Va. 695.

Having reached the conclusion that the plaintiffs have lost their title, whether the purchase by the State in 1877 is valid or invalid, it becomes wholly unnecessary to inquire into the validity of such purchase for the afterwards forfeiture for non-entry, renders the State's title, though otherwise defective, absolute and indefeasible.

It is said by Mr. Justice Harlin in the case of *King* v. *Mullens,* 171 U. S., on page 435, this "is a case of sheer neglect upon the part of the land owner to perform the duty required of him by the Constitution and statutes of the state." Plaintiffs' counsel avers in his brief that, "The evidence in this case at bar shows that the commissioner of school lands refused to proceed against these lands, and thereby deprived the former owners of their right of redemption, or the right to contest the validity of the sale," and relies on this fact to give a court of equity jurisdiction, and cites *King* v. *Mullen* as upholding his conclusion. Counsel certainly had some other case in his mind, when preparing his brief, for it is alleged in plaintiff's bill that the commissioner of school lands was about to bring proceedings to sell their lands as forfeited to the State, and they pray 'that the said F. B. Smith, commissioner of school lands as aforesaid, be inhibited, restrained and enjoined from proceeding against said lands as forfeited and subject to be sold by him for the benefit of the school fund and by virtue of said pretended forfeiture and sale aforesaid." So that plaintiffs not only claim that the sale was void and prevented forfeiture, but satisfied the delinquency of the land and relieved them from the necessity of redeeming the same and paying any taxes thereon for the past twenty years. How long they expect this to last does not appear. Certainly they can hardly claim that the failure of the sheriff to return his report of sales within ten days would

render the land wholly immune from taxation. Not only have plaintiffs failed to make any attempt to redeem their land, but pray an injunction to prevent such opportunity being afforded them. A more inequitable plea could not possibly be presented. Courts of equity help those who are willing, anxious and ready to do equity, and do not permit themselves to be used as instruments to deprive the State of its just taxes on lands held only under its grants. No title is good without a grant, directly or indirectly, or mediately or immediately, from the State, and they who expect to keep their titles from returning to their ogirinal source must pay the taxes lawfully assessed and assessable against the same. Before the plaintiffs can prevail in equity they must redeem their title from the State in the manner pointed out by law. Until they do so, they cannot maintain this suit. *Davis* v. *Leving,* 50 W. Va. 431; *State* v. *Sponagle,* 45 W. Va. 415 (32 S. E. 283; *Totten* v. *Nighbert,* 41 W. Va. 95, (24 S. E. 627); *King* v. *Mullen,* 171 U. S. 404; *King* v. *Panther Lumber Co., Id.* 437.

The plaintiffs' bill was properly dismissed.

The decree is affirmed.

*Affirmed.*

BRANNON, JUDGE, *(concurring):*

I concur in the decision made in this case, because I think that time denies relief to the plaintiff. So many years have passed since the purchase by Craig, and the means of information to the owners of the land that it was not in fact delinquent open to them. They could have learned the facts by the slightest diligence and care. In fact they did know of them long ago, as far back as 1879. The bill is predicated upon fraud. Equity does not allow a man to lie supine through a generation. I think, therefore, *laches* bars the bill, and also the statute of limitation. But I am not as yet ready to hold that when land is sold to the State for delinquent taxes, even where the sale is void for irregularity, that its non-entry on the tax books after such sale will work its forfeiture. Section 23, chapter 29, Code, provides that, "Real estate purchased for the state at a sale for taxes shall not be thereafter entered on the land books, but the auditor shall keep a register thereof." Here is a positive prohibition against the entry of such land on the tax books, and I cannot see how

the owners can be remiss to the extent of the forfeiture of their land. They can redeem and reassess. We cannot say that if not re-entered for taxes the owners cheat the State out of her taxes as the land is hers, and she can sell it, and take all its proceeds, if she chooses to deny them the excess over her taxes and interest and damages; and under the statutes as they are on redemption or sale she gets back all her taxes with twelve per cent. interest. She can lose nothing. The land is hers and not taxable. *State* v. *McEldowney*, 54 W. Va. 695; *State* v. *Belcher*, 53 *Id*. 359; *Totten* v. *Nighbert*, 41 *Id*. 800. In *Sayers* v. *Berkhart*, 85 Fed. 246, 29 C. C. A. 137, it was held that—"Where lands have been purchased by the State at a tax sale they cannot be forfeited for non-entry on the land books for taxation, under the statute of West Virginia, which provides that lands so sold shall not thereafter be entered for taxation unless redeemed." But it is said in this case that where the tax deed is void for irregularity it is the duty of the clerk or assessor, on request of the owner to restore the land to the tax books, and that that owner must cause him to do so by request or *mandamus*. I cannot see clearly as yet that in the face of a statute prohibiting the assessment of such land a clerk or assessor can assume the function of passing upon the validity of the tax sale, generally a most intricate and delicate question of law, and thus exercise judicial functions. The sale is colorable, its validity colorable, and I cannot see how it can be overthrown by the clerk or assessor.