# KING *v.* MULLINS.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WEST VIRGINIA.

No. 157. Argued March 22, 23, 1898.— Decided May 31, 1898.

The system established by the State of West Virginia, under which lands liable to taxation are forfeited to the State by reason of the owner not having them placed or caused to be placed, during five consecutive years, on the proper land books for taxation, and caused himself to be charged with the taxes thereon, and under which, on petition required to be filed by the representative of the State in the proper Circuit Court, such lands are sold for the benefit of the school fund, with liberty to the owner, upon due notice of the proceeding, to intervene by petition and secure a redemption of his lands from the forfeiture declared by paying the taxes and charges due upon them, is not inconsistent with the due process of law required by the Constitution of the United States or the constitution of the State.

As neither the plaintiff nor those under whom he claims title availed themselves of the remedy provided by the statutes of West Virginia for removing the forfeiture arising from the fact that, during the years 1884, 1885, 1886, 1887 and 1888, the lands in question were not charged on the proper land books with the state taxes thereon for that period or any part thereof, the forfeiture of such lands to the State was not displaced or discharged, and the Circuit Court properly directed the jury to find a verdict for the defendants. The plaintiff was entitled to recover only on the strength of his own title. Whether the defendants had a good title or not the plaintiff had no such interest in or claim to the lands as enabled him to maintain this action of ejectment.

*Reusens* v. *Lawson*, 91 Virginia, 226, approved and followed to the point that "In an action of ejectment the plaintiff must recover on the strength of his own title, and if it appear that the legal title is in another, whether that other be the defendant, the Commonwealth, or some third person,

.it is sufficient to defeat the plaintiff. If it appears that the title has been forfeited to the Commonwealth for the non-payment of taxes, or other cause, and there is no evidence that it has been redeemed by the owner, or resold, or regranted by the Commonwealth, the presumption is that the title is still outstanding in the Commonwealth."

THE case is stated in the opinion.

*Mr. Maynard F. Styles* for plaintiff in error.

*Mr. Z. T. Vinson* and *Mr. Holmes Conrad* for defendants in error.

*Mr. W. E. Chilton* and *Mr. James H. Ferguson* filed briefs for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action of ejectment was brought to recover that part lying in the State of West Virginia of a tract of 500,000 acres of land patented by the Commonwealth of Virginia in 1795 to Robert Morris, assignee of Wilson Cary Nicholas.

The persons sued were very numerous, but M. B. Mullins, Alexander McClintock and John McClintock having elected to sever in their defence from other defendants, the case was tried only as between them and the plaintiff King.

At the trial in the Circuit Court the plaintiff introduced in evidence the patent to Morris showing that the lands therein described were granted without conditions. Evidence was also introduced tending to show that by sundry mesne conveyances and legislative and judicial proceedings the title of Morris became vested, in 1866, in Robert Randall, trustee; in John R. Reed, trustee, on the 29th day of June, 1886; and through sundry mesne conveyances by Reed, trustee, David W. Armstrong and John V. LeMoyne in the plaintiff King on the 27th day of December, 1893.

The defendants resisted the claim of the plaintiff upon the general ground that prior to the date of the deed from Le-. Moyne, the lands embraced in the patent were absolutely forfeited to the State, and were so forfeited when the present action was instituted.

To show an outstanding title in the State to the lands in dispute by forfeiture, the defendants read in evidence a certificate of the auditor of the State, dated October 29, 1895, showing that neither Randall, trustee, nor Reed, trustee, nor LeMoyne, King, Armstrong and others named, had entered on the land books of Wyoming, McDowell, Logan, Boone or Mingo counties, or either of them, for the years 1883, 1884, 1885, 1886, 1887, 1888, 1889, 1890, 1891, 1892, 1893 and 1894, or either of them, a tract of 500,000 acres of land, nor paid taxes upon the land for any of those years. The certificate further stated that the tract of 500,000 acres was not entered on the books of the assessor in any of those counties for any of the years named; that no land was entered on the assessor's book in the name of any of said parties for any of those years; and that none of the above persons are charged on the land books with state taxes on any part of those lands.

We assume from the record that the greater part at least of the lands in West Virginia embraced in the Morris patent are in the above-named counties.

The defendants, further to maintain the issues on their part, offered in evidence —

1. A certified copy of the order of the Circuit Court of Wyoming County, West Virginia, (in which county part of the original tract was situated,) showing the appointment and qualification, on the 18th day of April, 1890, of E. M. Senter, commissioner of school lands for that county.

2. Also the annual report made by that officer to the Circuit Court of Wyoming County, March 31, 1894, and filed, of all tracts and parcels of land liable to be sold for the benefit of the school fund, as required by section 5 of chapter 105 of the Code of West Virginia, as amended by the act of the legislature of 1893, chapter 24. That report gives the list of various tracts in the county of Wyoming "heretofore purchased for the State at sales thereof for delinquent taxes and not redeemed within one year or within the time required by law, made up from the records in the auditor's office and certified by the auditor to the clerk of the Circuit Court to be sold by the commissioner of school lands." The report also

states : "Said commissioner of school lands would further report that in the annual report of the commissioner of school lands for the year 1889 there was reported for sale for the benefit of the school fund 50,000 acres, forfeited in the name of the Pittsburgh National Bank of Commerce, and sold on the — day of —— for the non-payment of the taxes due thereon for the years 1883 and 1884, and purchased by the State. . . . The commissioner of the Circuit Court who was appointed to report upon proceedings heretofore instituted to sell the lands of said Pittsburgh National Bank of Commerce and Smith and Fougeray reported them a part of 500,000 acre survey, Robert Morris patent, known as the 'Robert E. Randall land,' and that a suit was pending in the Circuit or District Court of the United States for the District of West Virginia, and that proceedings to sell the same under said formal proceedings had been enjoined. Said commissioner is advised that an error was made in said matter, and that no suit was pending in said United States court with reference to said 500,000 acre survey. The said commissioner of school lands would further report that it has come to his knowledge from Henry C. King, the present owner and claimant thereof, that a tract of 500,000 acres of land, lying partly in this county and partly in the counties of Logan and McDowell, and the greater portion in the States of Virginia and Kentucky, was at the April term, 1883, of the Circuit Court of this county redeemed from a former forfeiture by Robert E. Randall, trustee, and all the taxes thereon paid prior to and including the year 1883 ; that since said redemption the said land has been omitted from the land books of this county for five consecutive years, to wit, for the years 1884, 1885, 1886, 1887 and 1888, and thereby the same has been forfeited to the State in the name of Robert E. Randall, trustee. The said commissioner of school lands further reports that each of said tracts hereinbefore mentioned are liable to be sold for the benefit of the school fund of this State on account of the forfeiture herein stated ; all of which is respectfully submitted."

3. A certified copy of an order of the Circuit Court of

Logan County, West Virginia, made April 1, 1889, showing the appointment of U. B. Buskirk as commissioner of school lands of that county, and his annual report, as such commissioner, of all tracts and parcels of land in Logan County theretofore reported for sale for the benefit of the school fund to the clerk of the Circuit Court of that county under sections 1 and 2 of chapter 105 of the Code of West Virginia, and all lands in that county not theretofore reported, which in his opinion were liable to sale for the benefit of that fund.

4. A certified copy of an order of the Circuit Court of Logan County, West Virginia, ordering suit to be brought in the name of the State for the sale of the lands mentioned in the report of Commissioner Buskirk.

The defendants having rested their case, the plaintiff to prove that no forfeiture of the land or outstanding title thereto existed or was claimed by the State of West Virginia, and that there was no record of any forfeiture where the same would be found if it existed, introduced and read in evidence a certificate of the auditor of the State, dated October 30, 1895, certifying that he had carefully examined the record books of forfeited lands returned and kept in his office, as required by law, for the counties of Logan, Mingo, Wyoming and McDowell, West Virginia, from and including the year 1883 to date, and there did not appear on such books a tract of 500,000 acres of land, or any part thereof, or any other tract forfeited for any cause in the name of either Robert E. Randall, Robert E. Randall, trustee, A. D. Maupertures, John R. Reed, John R. Reed, trustee, John V. Le-Moyne, David W. Armstrong, or Henry C. King; that there were no lands from any of those counties entered on the record of forfeited lands of his office for either of those years, in the name of either or any of those parties; that he had carefully examined the record books of delinquent lands returned and kept in his office, as required by law, for the counties of Logan, Mingo, Wyoming and McDowell, West Virginia, from and including the year 1883 to date, and there did not appear on such record books a tract of 500,000 acres of land or any part thereof or any other tract delinquent for

any cause in the name of either Robert E. Randall, Robert E. Randall, trustee, A. D. Maupertures, John R. Reed, John R. Reed, trustee, John V. LeMoyne, David W. Armstrong or Henry C. King; and that there were no lands from any of those counties entered on the record of delinquent lands of his office for either or any of those years in the name of either or any of those parties.

The plaintiff further offered evidence tending to prove that all taxes of the State of West Virginia charged or chargeable upon said tract of land up to and including the year 1883 had been fully paid and discharged by Robert E. Randall, trustee, under whom plaintiff claimed title, and proved further that plaintiff was a purchaser of said tract for a valuable consideration and without knowledge or notice of any alleged forfeiture thereof or outstanding title thereto in West Virginia, or of any of the facts set out in the auditor's certificate, shown and referred to in plaintiff's bill of exceptions, except such notice as the land books and records duly kept disclosed.

At the instance of the defendants the court instructed the jury "that the title to the land claimed by the plaintiff, granted to one Robert Morris by the Commonwealth of Virginia, by patent dated June 23, 1795, was (prior to the date of the deed made by John V. LeMoyne to Henry C. King, under which the plaintiff now claims), under the provisions of the constitution of the State of West Virginia, forfeited to and vested in said State, and was so forfeited at the time this suit was instituted, and that therefore the plaintiff took and has no title to said land, and the jury are further instructed to render a verdict in favor of the defendants."

To this instruction the plaintiff objected upon the ground that the provisions of the constitution of West Virginia for the forfeiture of lands were repugnant to the Fourteenth Amendment of the Constitution of the United States, and to Article 3, sections 4, 5, 9, 10, 20, and Article 5, section 1, of the state constitution; and upon the further ground that if there were a forfeiture of said land to and an outstanding title in the State, such title could not be set up against the plaintiff in this action, he being a purchaser for value without

knowledge or notice of such forfeiture or of such outstanding title.

The plaintiff's objection having been overruled, and a verdict having been rendered by direction of the court for the defendants, judgment was entered that the plaintiff take nothing by his action.

The controlling question in this case relates to the validity under the Constitution of the United States of certain provisions in the constitution and statutes of West Virginia for the forfeiture of lands by reason of the failure of the owners during a given period to have them placed upon the proper land books for taxation.

The constitution of West Virginia provides that all private rights and interests in lands in that State derived from or under the laws of Virginia, and from or under the constitution and laws of West Virginia prior to the time such constitution went into operation, should "remain valid and secure, and shall be determined by the laws in force in Virginia prior to the formation of this State, and by the constitution and laws in force in this State prior to the time this constitution goes into effect." Art. XIII, § 1.

In view of this provision it is proper to look at the legislation of Virginia and the decisions of its highest court touching the forfeiture of lands for non-compliance by the owners with the requirements of the law relating to taxation.

By the first section of an act of the General Assembly of Virginia, passed February 27, 1835, further time was given until July 1, 1836, for the redemption of all lands and lots theretofore returned as delinquent for the non-payment of taxes, *west of the Alleghany Mountains*, and which had become vested on the previous 1st day of October in the president and directors of the Literary Fund; saving the title of any *bona fide* occupant claiming under a junior grant, whose rights were protected and secured under prior legislation.

That act further provided:

"And whereas it is known to the general assembly that many large tracts of lands lying west of the Alleghany Mountains which were granted by the Commonwealth before the

first day of April, 1831, never were, or have not been for many years past, entered on the books of the commissioners of the revenue where they respectively lie; by reason whereof no forfeiture for the non-payment of taxes has occurred, or can accrue, under the existing laws, the Commonwealth is defrauded of her just demands, and the settlement and improvement of the country is delayed and embarrassed; for remedy whereof,

" 2. *Be it enacted,* That each and every owner or proprietor of any such tract or parcel of land shall, on or before the first day of July, 1836, enter or cause to be entered on the books of the commissioners of the revenue for the county wherein any such tract or parcel of land may lie, all such lands now owned or claimed by him, her or them, through title derived mediately or immediately under grants from the Commonwealth, and have the same charged with all taxes and damages in arrear, or properly chargeable thereon, and shall also actually pay and satisfy all such taxes and damages which would not have been relinquished and exonerated by the second section of the act concerning delinquent and forfeited lands, passed March 10, 1832, had they been returned for their delinquency prior to the passage of that act; and upon their failure to do so, all such lands or parcels thereof not now in the actual possession of such owner or proprietor by himself, or his tenant in possession, shall become forfeited to the Commonwealth, after the 1st day of July, 1836, except only as hereinafter excepted.

" 3. That all right, title and interest which may hereafter be vested in the Commonwealth by virtue of the provisions of the section of this act next preceding herein, shall be transferred and absolutely vested in any and every person or persons other than those for whose default the same have been forfeited, their heirs or devisees, who are now in actual possession of said lands or any part or parcel of them, for so much thereof as such person or persons have just title or claim to, legal or equitable, *bona fide* claimed, held or derived from or under any grant of the Commonwealth bearing date previous to the 1st day of April, 1831, who shall have dis-

charged all taxes duly assessed and charged against him, her or them upon such lands, and all taxes that ought to have been assessed and charged thereon from the time when he, she or they acquired his, her or their title thereto, whether legal or equitable; *Provided,* That nothing in this section contained shall be so construed as to impair the right or title of any person or persons who have obtained grants from the Commonwealth for the same land and have regularly paid the taxes thereon, but in all such cases the parties shall be left to the strength of their original titles." Laws Va. 1834–35, c. 13, pp. 11–13.

Other acts were passed in Virginia relating to delinquent and forfeited lands and extending the time for redemption, all of them proceeding upon the ground that the State had the power to forfeit lands for failure to have them charged with taxes as well as for failure to pay the taxes so charged.

The first case in which the Supreme Court of Appeals of Virginia had occasion to pass upon the validity of the above statute of 1835, so far as it forfeited lands which the owner failed to have put on the proper land books and pay taxes upon, was *Staat's Lessee* v. *Board,* 10 Gratt. 400, 402, decided in 1853. That court said: "It further seems to the court that, as by the act of March 23, 1836, Sess. Acts, p. 7, time was allowed from the 1st day of November, 1836, for all persons to cause their omitted lands to be entered with the commissioner of the revenue, and to pay the taxes thereon, in the manner prescribed in the second section of the act of February 27, 1835, the forfeiture became absolute from and after the 1st of November, 1836. That the provision of the act of March 30, 1837, giving time for redemption until the 15th of January, 1838, did not release the forfeitures which had accrued, except in such cases where the owner or proprietor availed himself of the privilege of redeeming. And it further seems to the court that such forfeiture became *absolute* and *complete* by the failure to enter and pay the taxes thereon in the manner prescribed by the act of 27th of February, 1835. And *no inquisition or judicial proceedings or inquest, or finding of any kind, was required to consummate such forfeiture.*"

The same principle was announced in *Wild's Lessee* v. *Serpell*, 10 Gratt. 405, 408 (1853). The court said : "That the provisions of our statutes passed from time to time, making it the duty of the owners of lands 'to pay all taxes properly chargeable thereon, and, where they have been omitted from the books of the commissioners of the revenue, to cause them to be entered thereon in the proper counties, and to be charged with all arrearages of taxes and damages, and to pay all such arrearages as shall be found not to be released by law, and, in case of failure so to do, forfeiting to the Commonwealth all right and title whatever of the parties in default, (under the modifications and restrictions provided by the acts,) are within the constitutional competency of the legislature, has been sufficiently affirmed in decisions which have been made during the present term of this court in cases arising under these several statutes. *Staat's Lessee* v. *Board*, 10 Gratt. 400 ; *Smith's Lessee* v. *Chapman*, 10 Gratt. 445. The same cases also sufficiently establish that in order to consummate and perfect a forfeiture in such a case, no judgment or decree or other matter of record, nor any inquest of office, is necessary ; but that the statutes themselves, *of their own force and by their own energy*, work out their own purpose, and operate effectually to divest the title out of the defaulting owner, and perfectly to vest it in the Commonwealth, *without the machinery of any proceeding of record, or anything in the nature of an inquest of office.* And as the title is thus in a proper case divested out of the owner and vested in the Commonwealth by the operation of the statutes, so where the forfeiture enures to the benefit of a third person, claiming under the Commonwealth by virtue of another and distinct right, the transfer of the title to such person is, in like manner, perfect and complete without any new grant from the Commonwealth, or any proceeding to manifest the transfer by matter of record or otherwise. Upon these subjects I have nothing therefore to say upon this occasion, except that considering the peculiar condition of things in that part of the State lying west of the Alleghany Mountains, and the serious check to population and the improvement of the country

and the development of its .resources growing out of it, a resort to the stringent measures of legislation that were adopted was, in my opinion, as wise and expedient as the constitutional powers of the legislature to enact them was clear and unquestionable." This case was cited in *Armstrong* v. *Morrill*, 14 Wall. 120, 134, which was an action of ejectment brought prior to the adoption of the Fourteenth Amendment of the Constitution of the United States, and in which therefore the rights of the parties must have been determined without reference to the prohibition in that amendment against the deprivation of property without due process of law.

In *Levasser* v. *Washburn*, 11 Gratt. 572, 580–581, (1854) it was said : " According to the decisions of this court in the cases just referred to, and also in the cases of *Wild* v. *Serpell*, 10 Gratt. 405, and *Smith's Lessee* v. *Chapman*, 10 Gratt. 445, the Circuit Court also erred in its opinion as to the time at which the forfeiture under the Girond grant occurred or became complete. It appears to have proceeded on the notion that some inquest of office, or decree, or other proceeding should have been had in order to declare and perfect the for-feiture. Nothing of the kind was necessary. The act of the 27th of February, 1835, Sess. Acts, p. 11, declaring that lands which had been omitted from the books of the commissioners of the revenue should be forfeited unless the owners should cause the same to be entered and charged with taxes, and should pay the same, except such as might be released by law, was intended *by its own force and energy to render the forfeiture absolute and complete, without the necessity of any inquisition, judicial proceeding or finding of any kind, in order to consummate it.* It was perfectly within the competency of the legislature to declare such forfeiture and divest the title *by the mere operation of the act itself*, and the whole legislation upon the subject of delinquent and forfeited lands plainly manifests the intention to exercise its power in this form." See also *Usher's Heirs* v. *Pride*, 15 Gratt. 190, and *Smith* v. *Tharp*, 17 Gratt. 221.

In this connection it may be well to refer to *Martin* v. *Snowden*, 18 Gratt. 100, 135–136, 139–140, (1868) in which the Supreme Court of Appeals of Virginia had occasion to

determine, as between the parties before it, the effect of the provisions in the acts of Congress of August 5, 1861, 12 Stat. 292, c. 45, and June 7, 1862, 12 Stat. 422, c. 98, relating to the direct taxation of lands. By the latter act it was provided that "the title of, in and to each and every piece or parcel of land upon which said tax has not been paid as above provided, shall thereupon become forfeited to the United States," and that "upon the sale hereinafter provided for, shall vest in the United States or in the purchasers at such sale, in fee simple, free and discharged from all prior liens, incumbrances, right, title and claim whatsoever." § 4. One of the questions presented in that case was, whether the first of the clauses just quoted worked, *proprio vigore*, a transfer to the United States of the title to the land declared to be forfeited. The court held that the acts of Congress did not and were not intended to create such a forfeiture of the land to the United States as that it ceased *ipso facto* to be the property of the former owner and became the absolute property of the United States; that Congress was without constitutional power to impose the penalty of forfeiture of lands for the non-payment of taxes; that Congress had all the powers for enforcing the collection of its taxes that were in use by the Crown in England, or were in use by the States at the time of the adoption of the Constitution, but forfeiture of the land assessed with the tax was not then in use, either in England or the States, as a mode of collecting the tax. Referring to *Murray's Lessee* v. *Hoboken Land and Improvement Co.*, 18 How. 272, the state court further said: "Can a forfeiture of the land charged with taxes, such as is contended for in these cases, be regarded as 'due process of law,' upon the principles established by that case? Literally speaking, it is not any process at all, but operates by force of law and without any process or proceeding whatever, except the ascertainment by the commissioners of the sum chargeable on the land. But that is probably immaterial. The forfeiture of land to the Crown does not appear to have been a means recognized and employed in England at any period of its history for enforcing the payment of taxes or other debts to the Crown. If it had been, we should have

found such forfeitures treated of in the English law books; but we nowhere find them mentioned." Again: "These references will show what were the ordinary methods of enforcing the payment of taxes in use in Virginia about the time of the adoption of the constitution. And it may be worth mentioning, that before the adoption of the Constitution of the United States the legislature of Virginia had reënacted the provision of Magna Charta, that no freeman shall be taken or imprisoned, or be deprived of his freehold or liberties or free customs, or be outlawed or exiled, or any otherwise destroyed, nor shall the Commonwealth pass upon him nor condemn him, but by the lawful judgment of his peers, or by the law of the land. 12 Hening's St. at L. c. 81, p. 186. Looking at the spirit which animated all this legislation, we cannot doubt as to what would have been thought, at that day, of a statute declaring an immediate and absolute forfeiture of the whole land as a penalty for the non-payment of the tax within sixty days after the assessment of it, without notice to the owner, by advertisement or otherwise, of the assessment, and without any, even the least, effort to collect it."

The case of *Martin* v. *Snowden* was brought here and is reported under the title of *Bennett* v. *Hunter*, 9 Wall. 326, 335–337, (1869). This court did not deem it necessary in that case to decide whether the United States could constitutionally take to itself the absolute title to lands merely because of the non-payment of taxes thereon within a prescribed time, and without some proceeding equivalent to office found. Speaking by Chief Justice Chase, it said: "We are first to consider whether the first clause of this section, *proprio vigore*, worked a transfer to the United States of the land declared to be forfeited. The counsel for the plaintiff in error have insisted earnestly that such was its effect. But it must be remembered that the primary object of the act was, undoubtedly, revenue, to be raised by collection of taxes assessed upon lands. It is true that a different purpose appears to have dictated the provisions relating to redemption after sale, and to the disposition of the lands purchased by the government; a policy which had reference to the suppression of rebellion rather

than to revenue. But this purpose did not affect the operation of the act before sale, for until sale actually made there could be, properly, no redemption. The assessment of the tax merely created a lien on the land, which might be discharged by the payment of the debt. And it seems unreasonable to give to the act, considered as a revenue measure, a construction which would defeat the right of the owner to pay the amount assessed and relieve his lands from the lien. The first clause of the act, therefore, is not to be considered as working *an actual transfer of the land to the United States,* if a more liberal construction can be given to it consistently with its terms. *Now, the general principles of the law of forfeiture seem to be inconsistent with such a transfer.* Without pausing to inquire whether, in any case, the title of a citizen to his land can be divested by forfeiture and vested absolutely in the United States, without any inquisition of record or some public transaction equivalent to office found, it is certainly proper to assume that an act of sovereignty so highly penal is not to be inferred from language capable of any milder construction. *Fairfax's Devisee* v. *Hunter's Lessee,* 7 Cranch, 625. In the case of lands forfeited by alienage the king could not acquire an interest in the lands except by inquest of office. 3 Bl. Com. 258. And so of other instances where the title of the sovereign was derived from forfeiture." Again: "Applying these principles to the case in hand, it seems quite clear that the first clause of the fourth section was not intended by Congress to have the effect attributed to it, independently of the second clause. It does not direct the possession and appropriation of the land. It was designed, rather, as we think, to declare the ground of the forfeiture of title, namely, non-payment of taxes, while the second clause was intended to work the actual investment of the title through a public act of the government in the United States, or in the purchaser at the tax sale. The sale was the public act, which is the equivalent of office found. What preceded the sale was merely preliminary, and, independently of the sale, worked no divestiture of title. The title, indeed, was forfeited by non-payment of the tax; in other words, it be-

came subject to be vested in the United States, and, upon public sale, became actually vested in the United States or in any other purchaser; but not before such public sale. It follows that in the case before us the title remained in the tenant for life with remainder to the defendant in error, at least until sale; though forfeited, in the sense just stated, to the United States."

We now come to an examination of the West Virginia constitution and statutory provisions relating to the forfeiture to the State of lands subject to taxation.

By Article XIII of the constitution of West Virginia of 1872 it was provided:

"4. All lands in this State, waste and unappropriated, or heretofore or hereafter for any cause forfeited, or treated as forfeited, or escheated to the State of Virginia or this State, or purchased by either and become irredeemable, not redeemed, released, transferred or otherwise disposed of, the title whereto shall remain in this State till such sale as is hereinafter mentioned be made, shall by proceedings in the Circuit Court of the county in which the lands or a part thereof, are situated, be sold to the highest bidder.

"5. The former owner of any such land shall be entitled to receive the excess of the sum for which the land may be sold over the taxes charged and chargeable thereon, or which, if the land had not been forfeited, would have been charged or chargeable thereon, since the formation of this State, with interest at the rate of twelve per centum per annum, and the costs of the proceedings, if his claim be filed in the Circuit Court that decrees the sale, within two years thereafter.

"6. It shall be the duty of every owner of land to have it entered on the land books of the county in which it, or a part of it, is situated, and to cause himself to be charged with the taxes thereon, and pay the same. *When for any five successive years after the year* 1869 *the owner of any tract of land containing one thousand acres or more shall not have been charged on such books with state tax on said land, then by operation hereof the land shall be forfeited and the title thereto vest in the State.* But if, for any one or more of such five

years the owner shall have beeñ charged with a state tax on any part of the land, such part thereof shall not be forfeited for such cause. And any owner of land so forfeited, or of any interest therein at the time of the forfeiture thereof, who shall then be an infant, married woman or insane person, may, until the expiration of three years after the removal of such disability, have the land, or such interest charged on such books, with all state and other taxes that shall be, and but for the forfeiture would be, chargeable on the land or interest therein for the year 1863, and every year thereafter with interest at the rate of ten per centum per annum; and pay all taxes and interest thereon for all such years, and thereby redeem the land or interest therein : *Provided,* Such right to redeem shall in no case extend beyond twenty years from the time such land was forfeited." The duty imposed upon owners of land by the first clause of this section was also prescribed by the statutes of the State.

Such being the provisions of the constitution of West Virginia in relation to the forfeiture of lands, the Supreme Court of Appeals of that State had occasion in *McClure* v. *Maitland,* 24 W. Va. 561, 575–578, to determine their scope and effect. In that case it was said : " In the year 1831, as we have endeavored to show in a former part of this opinion, the land titles in that portion of the Commonwealth of Virginia now embraced within this State were in a most wretched and embarrassed condition. Many owners of large tracts, covering in some cases almost entire counties, would neither pay their taxes nor settle and improve their lands, thus paralyzing the energy and contravening the prosperity of the people and the advancement and population of the State to an almost inconceivable extent. In this emergency and to remedy this calamitous evil, the general assembly of Virginia inaugurated the system of delinquent and forfeiture laws that form the basis of the provisions of our present constitution on that subject. The whole history of that system shows a most earnest and determined effort on the part of the legislature, the judiciary and the people, speaking through our present constitution, to destroy and annihilate the titles of such delinquent

owners, who should, after every reasonable opportunity had been given them to comply with the laws, continue in default, and to protect actual settlers and these not in default. The purpose of the statutes passed to enforce this system was not merely to create a lien for the taxes on these delinquent and unoccupied lands, but to effect *by their own force and vigor an absolute forfeiture of them and effectually vest the title thereto in the State without the machinery of any proceeding of record or anything in the nature of an inquest of office. Such was intended to be and such was in fact the effect of these statutes.* The constitutional competency of the legislature to pass these laws and thus consummate the forfeiture and perfectly divest all the right, title and interest of the former owner by the mere energy and operation of the statutes themselves, has been repeatedly affirmed by the Court of Appeals of Virginia" — citing *Staats* v. *Board,* 10 Gratt. 400; *Wild* v. *Serpell,* 10 Gratt. 405; *Levasser* v. *Washburn,* 11 Gratt. 572; *Usher* v. *Pride,* 15 Gratt. 190 and *Smith* v. *Tharp,* 17 W. Va. 221.

So in *Coal Co.* v. *Howell,* 36 W. Va. 489, 501, the court referred to its former decisions, above cited, and after observing that they had been adhered to with only a seeming exception, said : "The forfeitures became complete and absolute by operation of law — in the case of delinquent lands on the 1st day of October, 1834, and in the case of omitted lands on November 1, 1836, *and no inquisition or judicial proceeding or inquest or finding of any kind was required to consummate such forfeiture.*"

Now, the plaintiff contends that the provision in the constitution of West Virginia which forfeits and vests absolutely in the State without inquisition of record, or some public transaction equivalent to office found, the title to lands which for five successive years after 1869 have not been charged with state taxes on the land books of the proper county, is repugnant to the clause of the Fourteenth Amendment of the Constitution of the United States declaring that no State shall deprive any person of his property without due process of law.

In support of this contention numerous authorities have

been cited by the plaintiff, those most directly in point being *Griffin* v. *Mixon*, 38 Mississippi, 424, (1860) and *Marshall* v. *McDaniel*, 12 Bush, 378, 382–5, (1876). In the first of those cases, the High Court of Errors and Appeals of Mississippi, speaking by Judge Harris, held a statute of that State declaring the forfeiture of lands on the failure simply of the owner to pay the taxes due thereon, without notice or hearing in any form, to be in violation of the constitutional provisions prohibiting the taking of private property for public use without just compensation being first made therefor, or the deprivation of property without due process of law. In the other case, the Court of Appeals of Kentucky held to be unconstitutional a provision in a statute of that State declaring " that in all cases where any lands shall hereafter be forfeited for failing to list for taxation, or stricken off to the State, the title of such lands shall vest in this Commonwealth by virtue of this act without any inquest of office found, unless said land shall have been redeemed according to law." That court, speaking by Chief Justice Lindsay, said : " In pursuing this inquiry we need not call in question the power of the legislature to provide for the levy and collection of taxes in the most summary manner. The right of the Commonwealth, through its executive and ministerial officers, to assess property for taxation, to ascertain the sum payable by each taxpayer, and to seize and sell his property in satisfaction of such sum, is not open to doubt. It is equally clear the legislature may impose upon the taxpayer the duty of listing his property for taxation, and may prescribe, for the neglect of the duty so imposed, penalties reaching even to the forfeiture of the estate not listed. But when such laws are enacted, the forfeitures prescribed must be regarded as penalties, and they cannot be inflicted until inquiry has first been made and the commission of the offence ascertained by ' due course of law.' . . . ' To enjoin what shall be done or what left undone, and to secure obedience to the injunction by appropriate penalties, belongs exclusively to legislation. To ascertain a violation of such injunction and inflict the penalty belongs to the judicial function.' *Gaines* v. *Buford*, 1 Dana, 481.

By the Magna Charta it is declared that no citizen shall be disseized of his freehold or be condemned but by the lawful judgment of his peers or by the law of the land. The substance of this declaration is contained in our Bill of Rights. Its meaning and intention is that no man shall be deprived of his property without being first heard in his own defence. . . . We conclude without hesitation that so much of the act of 1825 as provided that for a mere failure to list lands for taxation the title should be forfeited, and should *ipso facto*, without inquiry or trial, and without opportunity to the party supposed to be in default, even to manifest his innocence, be vested in the Commonwealth, is unconstitutional and void."

The question of constitutional law thus presented is one of unusual gravity. On the one hand, it must not be forgotten that the clause of the National Constitution which this court is now asked to interpret is a part of the supreme law of the land, and that it must be given full force and effect throughout the entire Union. The due process of law enjoined by the Fourteenth Amendment must mean the same thing in all the States. On the other hand, a decision of this court declaring that that amendment forbids a State, by force alone of its constitution or statutes, and without inquisition or inquiry in any form, to take to itself the absolute title to lands of the citizen because of his failure to put them on record for taxation, or to pay the taxes thereon, might greatly disturb the land titles of two States under a system which has long been upheld and enforced by their respective legislatures and courts. Under these circumstances, our duty is not to go beyond what is necessary to the decision of the particular case before us. If the rights of the parties in this case can be fully determined without passing upon the general question whether the clause of the West Virginia constitution in question, *alone considered*, is consistent with the national Constitution, that question may properly be left for examination until it arises in some case in which it must be decided.

We come then to inquire whether, looking at the constitution and the statutes of West Virginia together, a remedy

was not provided which, if pursued, furnished to the plaintiff and those under whom he asserts title all the opportunity that "due process of law" required in order to vindicate any rights that he or they had in respect of the lands in question.

We have seen that the lands embraced by the patent to Robert Morris were not put upon the land books of the proper counties during the years 1883 to 1894, both inclusive. They were redeemed in 1883 from forfeiture by Randall, trustee, in whom, as we take it, the title was at that time vested. Let it be assumed that they were again forfeited to the State upon the expiration of the five consecutive years after 1883 during which they were not placed on the land books for taxation; in other words, that for that reason they were forfeited to the State after the year 1888. What, at the time of such forfeiture, were the rights of the owner? Did the statutes of the State give him any remedy whereby he could be relieved from such forfeiture? Was he denied all opportunity to hold the lands upon terms just and reasonable both to him and the State?

We pass by the act of November 18, 1873, providing for the sale of escheated, forfeited and unappropriated lands for the benefit of the school fund, act of W. Va. 1872–73, p. 449, c. 134, and also, for the present, the act of March 25, 1882, on the same subject, acts of W. Va. 1882, p. 253, c. 95, because both of those acts are amendatory of the Code of West Virginia, and their provisions, so far as they directly or indirectly bear upon the present controversy, are preserved and extended in the Code published in 1887, which contained the law of the State in reference to forfeited lands as it was at that time.

From Chapter 105 of the Code of West Virginia, published in 1887, it appears that all lands forfeited to the State for the failure to have the same entered upon the land books of the proper county and charged with the taxes thereon, as provided by law — so far as the title thereof was not vested in junior grantees or claimants under the provisions of the constitution and laws of the State — were *required* to be sold for the benefit of the school fund — the auditor to certify

to the clerk of the Circuit Court a list of all such lands (which, or the greater part of which, were in his county), within sixty days after the title thereto vested in the State. That act made it the *duty* of the commissioner of school lands to file his petition in the Circuit Court and pray for the sale of the lands for the benefit of the school fund. He was required to state in his petition "all the tracts, lots and parts and parcels of any tract or lot of land, so liable to sale, in the Circuit Court of his county, praying that the same be sold for the benefit of the school fund" and, according to the best of his information and belief, "the local situation, quantity or supposed quantity, and probable value of each tract, lot or parcel, and part of a tract of land herein mentioned, together with all the facts at his command, in relation to the title to the same, and to each tract, lot, part or parcel thereof, *the claimant or claimants thereof*, and their residence, if known, and, if not known, that fact shall be stated, and stating also how and when and in whose name every such tract, lot and parcel, and part of a tract or lot, was forfeited to the State." Provision was made for the reference of the petition to a commissioner in chancery, " with instructions to inquire into and report upon the matters and things therein contained, and such others as the court may think proper to direct, and particularly to inquire and report as to the amount of taxes and interest due and unpaid on each tract, lot and parcel, and part of a tract or lot of land mentioned in the petition, in whose name it was forfeited, and when and how forfeited, in whom the legal title was at the time of the forfeiture, and if more than one person claimed adverse titles thereto at the date of the forfeiture, the name of each of such claimants and a reference to the deed book or books in which the title papers of any claimant thereof can be found; what portion or portions, if any, of such lands is claimed by any person or persons under the provisions of section three of article thirteen of the constitution of this State, with the names of such claimants and the amount claimed by each as far as he can ascertain the same." If there were no exception to this report, or if there were any which were overruled, " the court

shall confirm the same *and decree a sale* of the lands, or any part of them, therein mentioned, which are subject to sale, for the benefit of the school fund, upon such terms and conditions, as to the court may seem right and proper; and in any decree of sale made under this chapter, the court may provide that the commissioner of school lands, or other person, appointed commissioner to make such sale, may receive bids for such lands, without any notice of sale; and if the former owner or owners, or person in whose name the land was returned delinquent, and forfeited, or the heirs or grantee of such owner or person, or any person or persons, holding a valid subsisting lien thereon, at the time of such forfeiture, bid a sum sufficient to satisfy such decree and the costs of the proceeding and sale, and such person or persons, so bidding, be the highest bidder, said commissioner shall sell the land on such bid, and report the same to the court for confirmation; but if the commissioner receive no bid from any such person, or if he shall receive a higher bid therefor, from any other person, not so mentioned, then, and in either event, the said commissioner shall sell the land, at public auction to the highest bidder, after first giving such notice, as may be provided by such decree." By the same act it was provided: "The former owner of any such land shall be entitled to recover the excess of the sum for which the land may be sold over the taxes charged and chargeable thereon, or which, if the land had not been forfeited, would have been charged or chargeable thereon, since the formation of this State, with interest at the rate of twelve per centum per annum and the costs of the proceedings, if his claim be filed in the Circuit Court that decrees the sale, within two years thereafter, as provided in the next succeeding section."

But the part of Chapter 105 of the Code which has the most direct bearing on the question under consideration is section 14, which after providing that the owner may, upon his petition to the Circuit Court, obtain an order for the payment to himself of the excess just mentioned, proceeds: "At any time during the pendency of the proceedings for the sale of any such land as hereinabove mentioned, such former owner, or any

creditor of such former owner of such land, having a lien
thereon, may file his petition in said Circuit Court as herein-
before provided, and asking to be allowed *to redeem such part
or parts of any tract of land so forfeited, or the whole thereof,*
as he may desire, and upon such proof being. made as would
entitle the petitioner to the excess of ·purchase money herein-
before mentioned, such court may allow him to redeem the
whole of such tract if he desire to redeem the whole, or such
part or parts thereof, as he may desire, less than the whole,
upon the payment into court, or to the commissioner of
school lands, all costs, taxes and interest due thereon, as pro-
vided in this chapter, if he desire to redeem the whole of such
tract; or if he desire to redeem less than the whole of such
tract, upon the payment, as aforesaid, of so much of the costs,
taxes and interest due on such tract as will be a due proportion
thereof for the quantity so redeemed.   But if the petition be
for the redemption of a less quantity than the whole of such
tract, it shall be accompanied with a plat and certificate of
survey of the part or parts thereof sought to be redeemed.
Whenever it shall satisfactorily appear that the petitioner is
entitled to redeem such tract, or any part or parts thereof, the
court shall make an order showing the sum paid in order to
redeem the whole tract or the part or parts thereof which the
petitioner desires to redeem, and *declaring the tract, or part or
parts thereof, redeemed from such forfeiture,* so far as the title
thereto was in the State immediately before the date of such
order; which order, when so made, *shall operate as a release
of such forfeiture so far as the State is concerned,* and of all
former taxes on said tract, or part or parts thereof so redeemed,
and no sale thereof shall be made.   If the redemption be of a
part or parts of a tract, the plat or plats and certificate of the
survey thereof hereinbefore mentioned, together with a copy
of the order allowing the redemption, shall be recorded in a
deed book in the office of the clerk of the county court.   *Pro-
vided,* That such payment and redemption shall in no way
affect or impair the title to any portion of such land trans-
ferred to and vested in any person, as provided in section three
of article thirteen of the constitution of this State."

It thus appears that when the lands in question and others embraced in the Morris patent were, as is contended, forfeited to the State for the failure of the owner during the five consecutive years after they were redeemed by Randall, trustee, in 1883, to have them entered upon the land books of the proper county and charged with the taxes thereon, it was provided by the statutes of West Virginia:

That all lands thus forfeited to the State should be sold for the benefit of the school fund;

That the sale should be sought by petition filed by the commissioner of school lands in the proper Circuit Court, to which proceeding all claimants should be made parties, and be brought in by personal service of summons upon all found in the county, or by publication as to those who could not be found;

That the petition should be referred to a commissioner in chancery, who should report upon the same and upon such other things as the court might direct, and particularly as to the amount of taxes due and unpaid upon any lands mentioned in the petition, in whose name and when and how forfeited, and in whom the legal title was at the time of the forfeiture;

That if there were no exceptions to the report, or if there were exceptions which were overruled, the court was required to confirm the same and decree a sale of the lands for the benefit of the school fund; and,

That at any time during the pendency of the proceedings instituted for the sale of forfeited lands for the benefit of the school fund, the owner, or any creditor of the owner having a lien thereon, might file his petition in the Circuit Court of the county for the redemption of his lands upon the payment into court, or to the commissioner of school lands, of all costs, taxes and interest due thereon, and obtain a decree or order declaring the lands redeemed so far as the title thereto was in the State immediately before the date of such order.

These provisions were substantially preserved in Chapter 105 as amended and reënacted in 1891 and 1893. Code of West Va. 1891, p. 731; acts of West Va. 1893, p. 57. But in the Code of 1891, act of March 12, 1891, will be found this additional and important provision, Acts 1891, c. 94:

"§ 18. In every such suit brought under the provisions of this chapter, the court shall have full jurisdiction, power and authority to hear, try and determine *all questions of title*, possession and boundary which may arise therein, as *well as any and all conflicting claims whatever to the real estate in question arising therein*. And the court, in its discretion, may at any time, regardless of the evidence, if any, already taken therein, direct an issue to be made up and tried at its bar as to any question, matter or thing arising therein, which, in the opinion of the court, is proper to be tried by a jury. And if any such issue be as to the question of title, possession or boundary of the land in question, or any part of it, it shall be tried and determined in all respects as if such issue was made up in an action pending in such court. And every such issue shall be proceeded in, and the trial thereof shall be governed by the law and practice applicable to the trial of an issue out of chancery ; and the court may grant a new trial therein as in other cases tried by a jury." And this provision was preserved, substantially, in the act of 1893, amendatory of Chapter 105 of the Code of West Virginia.

If, as contended, the State, without an inquisition or proceeding of some kind declaring a forfeiture of lands for failure during a named period to list them for taxation, and by force alone of its constitution or statutes, could not take the absolute title to such lands, still it was in its power by legislation to provide, as it did, a mode in which the attempted forfeiture or liability to forfeiture could be removed and the owner enabled to retain the full possession of and title to his lands. We should therefore look to the constitution and statutes of the State together for the purpose of ascertaining whether the *system* of taxation established by the State was, in its essential features, consistent with due process of law. If, in addition to the provisions contained in the constitution, that instrument had itself provided for the sale of forfeited lands for the benefit of the school fund, but reserved the right to the owner, before sale and within a reasonable period, to pay the taxes and charges due thereon, and thereby relieve his land from forfeiture, we do not suppose that such a system would

be held to be inconsistent with due process of law. If this be true it would seem to follow necessarily that if the statutes of the State, in connection with the constitution, gave the taxpayer reasonable opportunity to protect his lands against a forfeiture arising from his failure to place them upon the land books, there is no ground for him to complain that his property has been taken without due process of law.

Much of the argument on behalf of the plaintiff proceeds upon the erroneous theory that all the principles involved in due process of law as applied to proceedings strictly judicial in their nature apply equally to proceedings for the collection of public revenue by taxation. On the contrary, it is well settled that very summary remedies may be used in the collection of taxes that could not be applied in cases of a judicial character. This subject was fully considered in *Murray's Lessee* v. *Hoboken Land and Improvement Co.*, 18 How. 272, 280, 281, 282, which arose under the act of Congress of May 15, 1820, providing for the better organization of the Treasury Department. The account of a collector of customs having been audited by the first auditor and certified by the first comptroller of the Treasury, a distress warrant for the balance found to be due was issued by the solicitor of the Treasury, in accordance with the act of Congress, and levied upon the lands of the collector. The question presented was whether such a proceeding was consistent with due process of law — the objection to it being that it was judicial in its nature and that it operated to deprive the debtor of his property without a hearing or trial by jury and without due process of law. This court said, among other things: "Tested by the common and statute law of England prior to the emigration of our ancestors and by the laws of many of the States at the time of the adoption of this amendment, the proceedings authorized by the act of 1820 cannot be denied to be due process of law when applied to the ascertainment and recovery of balances due to the Government from a collector of customs, unless there exists in the constitution some other provision which restrains Congress from authorizing such proceedings. For, though 'due process of law' generally

implies and includes *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, 2 Inst. 47, 50; *Hoke* v. *Henderson,* 4 Dev. N. C. Rep. 115; *Taylor* v. *Porter,* 4 Hill, 140, 146; *Van Zandt* v. *Waddel,* 2 Yerger, 260; *State Bank* v. *Cooper,* 2 Yerger, 599; *Jones's Heirs* v. *Perry,* 10 Yerger, 59; *Greene* v. *Briggs,* 1 Curtis, 311, yet, this is not universally true. There may be, and we have seen that there are cases, under the law of England after Magna Charta, and as it was brought to this country and acted on here, in which process, in its nature final, issues against the body, lands and goods of certain public debtors without any such trial; and this brings us to the question, whether those provisions of the Constitution which relate to the judicial power are incompatible with these proceedings." Again: " The power to collect and disburse revenue, and to make all laws which shall be necessary and proper for carrying that power into effect, includes all known and appropriate means of effectually collecting and disbursing that revenue, unless some such means should be forbidden in some other part of the Constitution. The power has not been exhausted by the receipt of the money by the collector. Its purpose is to raise money and use it in payment of the debts of the government; and, whoever may have possession of the public money, until it is actually disbursed, the power to use those known and appropriate means to secure its due application continues. As we have already shown, the means provided by the act of 1820 do not differ in principle from those employed in England from remote antiquity — and in many of the States, so far as we know, without objection — for this purpose, at the time the Constitution was formed. It may be added, that probably there are few governments which do or can permit their claims for public taxes, either on the citizen or the officer employed for their collection or disbursement, to become subjects of judicial controversy, according to the course of the law of the land. Imperative necessity has forced a distinction between such claims and all others, which has sometimes been carried out by summary methods of proceeding and sometimes by

systems of fines and penalties, but always in some way ob-
served and yielded to." In *Bell's Gap Railroad* v. *Pennsyl-
vania,* 134 U. S. 232, 239, it was said that "the process of
taxation does not require the same kind of notice as is re-
quired in a suit at law, or even in proceedings for taking pri-
vate property under the power of eminent domain. It
involves no violation of due process of law when it is exe-
cuted according to customary forms and established usages,
or in subordination to the principles which underlie them."
This must be so, else the existence of government might be
put in peril by the delays attendant upon formal judicial
proceedings for the collection of taxes.

In this connection reference may be made to what was said
by the Supreme Court of Appeals in *McClure* v. *Maitland,*
above cited, touching the rights of the owner of lands forfeited
to the State, and for the sale of which proceedings were insti-
tuted by the commissioner of school lands. That court said:
" The title to the land and all the right and interest of the
former owner having thus by his default and the operation of
the law become absolutely vested in the State and become
irredeemable, she, having thus acquired a perfect title to, and
unqualified dominion over, the land, had the undoubted right
to hold or dispose of it for any proper purpose, in any manner
and upon any terms and conditions she might in her sovereign
capacity deem proper, without consulting the former owner
or any one else. For after the forfeiture had become com-
plete, as it had in the case before us, the former owner had
no more claim to or lien upon the land than one who never
had pretended to own it. In the exercise of this perfect
dominion over her own property the State saw proper to
transfer and vest her title to so much of said land owned by
her, in any person, other than those who occasioned the de-
fault, as such person may have been in the actual possession
of, or have just title to, claiming the same and was not in de-
fault for the taxes thereon chargeable to him. . . . The
laws, as we have shown, by their own force, transferred to
and vested the title to the land absolutely in the State with-
out any judicial inquiry or inquest of any kind. There could,

therefore, be no necessity or reason for proceeding *in rem* against the land. That had already become the absolute property of the State, and she had a perfect right to sell it without further inquiry. All the laws providing for the sale of these lands presuppose the title to have vested in the State prior to the commencement of the proceedings. In fact the whole authority of the commissioner and the jurisdiction of the court are based upon the assumption that the unconditional title is in the State; for unless such is the fact neither has any authority to act. *Twiggs* v. *Chevallie*, 4 W. Va. 463. And all the right, title and interest of the former owner having been completely divested, he has not a particle of interest in the land — no more than if he had never owned it; there is, therefore, no possible reason for making him a party or proceeding against him *in personam* or otherwise. The proceeding is of necessity, then, neither *in rem* nor *in personam;* and as all judicial proceedings properly so styled must belong to either the one or the other of these classes, it follows that this is not and cannot be in any technical sense a judicial proceeding."

It is said that this shows that the taxpayer, after his land is forfeited to the State, is left by the statutes of West Virginia without any right or opportunity, by any form of judicial proceeding, to get it back or to prevent its sale, and, therefore, it is argued, he is absolutely divested of his lands solely by reason of his failure to place them on the proper land books.

An answer to this view is, that what was said in *McClure* v. *Maitland*, on this point, had reference to proceedings under the act of November 18, 1873, acts 1872–73, p. 449, c. 134, which were not judicial in their nature but administrative. But as declared in *Hays, Commissioner,* v. *Camden's Heirs*, 38 W. Va. 109, 110, the act of 1873 was so amended by the act of March 25, 1882, acts W. Va. 1882, p. 253, c. 95, as to make the proceeding in the Circuit Court for the sale of forfeited lands, in which the owners or claimants could intervene and effect a redemption of their lands from forfeiture, a judicial proceeding. This view was reaffirmed in *Wiant* v. *Hays, Commissioner*, 38 W. Va. 681, 684, in which Judge Brannon,

delivering the unanimous judgment of the state court, observed that what was said in *McClure* v. *Maitland* as to the landowner not being entitled of right to be made a party to the proceeding instituted for the sale of forfeited lands for the benefit of the school funds, had reference to the then existing act which was changed by the act of 1882. Answering the suggestion that the proceedings under the new law were not judicial, the court said: " Now, why, with parties plaintiff and defendant, process, pleading, hearing between the parties, decree, etc., it is not, if not technically a chancery suit, yet a suit, I cannot see; a suit under a special statute, it is true, but none the less a suit. So, substantially, it was regarded in *Hays* v. *Camden's Heirs*, 38 W. Va. 109, 18 S. E. Rep. 461. Proceedings at rules take place as in ordinary and common law suits. In some places it is called a 'suit.' But I know that it is said by those holding the other view that the question is not to be tested by the circumstances, such as I have alluded to, the presence of pleading, process, hearing, etc., but it must be tested by the nature of the proceeding; that is, that it is only an administrative process by the State, through an officer and court, to realize money on its own property. But to this I reply that though the State might make the proceeding such, and did in its acts up to 1882, yet by its act in 1882 it changed the proceeding from one *ex parte* to one *inter partes*, and clothed the proceeding with all the habiliments of a suit; and still it did not proceed against the land, taking the act of forfeiture as a concession, and simply at once sell the land, but it subjected its right and title under the supposed forfeiture to question and investigation under the law through a suit, called in all interested adversely to its claim, and gave them leave to contest its right, and made its claim the subject of litigation."

It thus appears that under the statutes of West Virginia in force after 1882 the owner of the forfeited lands had the right to become a party to a judicial proceeding, of which he was entitled to notice, and in which the court had authority to relieve him, upon terms that were reasonable, from the forfeiture of his lands.

It is said that the landowner will be without remedy if the commissioner of the school fund should fail to institute the proceeding in which the statute permitted such owner to intervene by petition and obtain a redemption of his lands from the forfeiture claimed by the State. It cannot be assumed that the commissioner will neglect to discharge a duty expressly imposed upon him by law, nor that the courts are without power to compel him to act, where his action becomes necessary for the protection of the rights of the landowner.

It is further said that a forfeiture may arise under the constitution of West Virginia despite any effort of the landowner to prevent it; that although the owner may direct his lands to be entered on the proper land books, and that he be charged with the taxes due thereon, the custodian of such books may neglect to perform his duty. Thus, it is argued, the lands may be forfeited by reason of the landowner not having been, in fact, charged on the land books with the taxes due from him, although he was not responsible for such neglect. We do not so interpret the state constitution or the statutes enacted under it. If the landowner does all that is reasonably in his power to have his lands entered upon the land books and to cause himself to be charged with taxes thereon, no forfeiture can arise from the owner not having been "charged on such books" with the state tax. The State could not acquire any title to the lands merely through the neglect of its agent having custody or control of its land books. Any steps attempted to be taken by the officers of the State, based upon such neglect of its agent — the taxpayer not being in default — would be without legal sanction, and could be restrained by any court having jurisdiction in the premises. We go further and say, that any sale had under the statute providing for a sale, under the order of court, for the benefit of the school fund, of lands alleged to be forfeited by reason of their not having been charged on the land books for five consecutive years with the state tax due thereon, would be absolutely void, if the landowner was not before the court, or had not been duly notified of the proceedings, but had done all that he could reasonably do to have his lands en-

tered on the proper books and to cause himself to be charged with the taxes due thereon. If the State was not entitled to treat them *as forfeited lands*, that fact could be shown in the proceeding instituted for their sale as lands of that character, and the rights of the owner fully protected. In the present case, it does not appear that any evidence was offered tending to show that the absence from the land books of any charge of taxes on the lands claimed by the plaintiff during five consecutive years after their redemption by Randall, trustee, in 1883 was due to any neglect of the officers of the State, or that the plaintiff, or those under whom he asserts title, entered or attempted to enter the lands upon the land books, or that he or they caused or attempted to cause the lands to be charged with taxes thereon. But there was evidence tending to show that the requirements of the constitution were not met during any of the years from 1883 to the bringing of this action. So far as the record discloses, it is a case of sheer neglect upon the part of the landowner to perform the duty required of him by the constitution and statutes of the State.

Another point made by the plaintiff in error is, that the provision of the constitution of Virginia exempting tracts of less than one thousand acres from forfeiture is a discrimination against the owners of tracts containing one thousand acres or more, which amounts to a denial to citizens or landowners of the latter class of the equal protection of the laws. We do not concur in this view. The evil intended to be remedied by the constitution and laws of West Virginia was the persistent failure of those who owned or claimed to own large tracts of lands, patented in the last century, or early in the present century, to put them on the land books, so that the extent and boundaries of such tracts could be easily ascertained by the officers charged with the duty of assessing and collecting taxes. Where the tract was a small one, the probability was that it was actually occupied by some one, and its extent or boundary could be readily ascertained for purposes of assessment and taxation. We can well understand why one policy could be properly adopted as to large tracts which the necessities of the public revenue did not require to be pre-

scribed as to small tracts. The judiciary should be very reluctant to interfere with the taxing systems of a State, and should never do so unless that which the State attempts to do is in palpable violation of the constitutional rights of the owners of property. Under this view of our duty, we are unwilling to hold that the provision referred to is repugnant to the clause of the Fourteenth Amendment forbidding a denial of the equal protection of the laws.

For the reasons stated, we hold that the system established by West Virginia, under which lands liable to taxation are forfeited to the State by reason of the owner not having them placed or caused to be placed, during five consecutive years, on the proper land books for taxation, and caused himself to be charged with the taxes thereon, and under which, on petition required to be filed by the representative of the State in the proper Circuit Court, such lands are sold for the benefit of the school fund, with liberty to the owner, upon due notice of the proceeding, to intervene by petition and secure a redemption of his lands from the forfeiture declared by paying the taxes and charges due upon them, is not inconsistent with the due process of law required by the Constitution of the United States or the constitution of the State.

Having discussed all the points suggested by the assignments of error which we deem it necessary to examine, we conclude this opinion by saying that as neither the plaintiff nor those under whom he claims title availed themselves of the remedy provided by the statutes of West Virginia for removing the forfeiture arising from the fact that, during the years 1884, 1885, 1886, 1887 and 1888, the lands in question were not charged on the proper land books with the state taxes thereon for that period or any part thereof, the forfeiture of such lands to the State was not displaced or discharged, and the Circuit Court properly directed the jury to find a verdict for the defendants. The plaintiff was entitled to recover only on the strength of his own title. Whether the defendants had a good title or not the plaintiff had no such interest in or claim to the lands as enabled him to maintain this action of ejectment. We concur in what the Supreme Court of Appeals of Virginia said

in a case recently decided: "In an action of ejectment the plaintiff must recover on the strength of his own title, and if it appear that the legal title is in another, whether that other be the defendant, the Commonwealth, or some third person, it is sufficient to defeat the plaintiff. If it appears that the title has been forfeited to the Commonwealth for the non-payment of taxes, or other cause, and there is no evidence that it has been redeemed by the owner, or resold, or re-granted by the Commonwealth, the presumption is that the title is still outstanding in the Commonwealth." *Reusens* v. *Lawson,* 91 Virginia, 226.

The judgment of the Circuit Court of the United States is

*Affirmed.*